(C. D. 1343)

Mussman & Shafer, Inc. *v.* United States

United States Customs Court, Second Division

(Decided July 5, 1951)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
David N. Edelstein, Assistant Attorney General (*John J. McDermott, Guy G. Ribaudo, Arthur R. Martoccia,* and *Charles J. Wagner,* special attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Rao, Judge: Mussman & Shafer, Inc., plaintiff herein, made two importations from Finland of certain merchandise described on the invoices as "Savoboards (Hardboards) ⅛″ thick 4 x 12′." The collector of customs at the port of Cincinnati, Ohio, classified said merchandise as pulpboard, lined, and assessed duty thereon at the rate of 15 per centum ad valorem, pursuant to the provisions of paragraph 1413 of the Tariff Act of 1930, as modified by the trade agreements with Sweden (68 Treas. Dec. 19, T. D. 47785) and with Finland (70 Treas. Dec. 369, T. D. 48554).

It is the claim of the plaintiff that the hardboard or pulpboard involved in this case was neither lined, nor subjected to any of the

. other processes described in said paragraph 1413, and that therefore it should have been assessed with duty at only 10 per centum ad valorem, under the provisions of paragraph 1402 of the Tariff Act of 1930, as modified by said trade agreements.

A reference to the pertinent paragraphs of the Tariff Act of 1930 immediately reveals that they are complementary provisions, both providing for paper board, wallboard, and pulpboard, including cardboard, and leather board or compress leather. However, whereas paragraph 1402, *supra*, encompasses such of these articles only as have not been "plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, decorated or ornamented in any manner," paragraph 1413, *supra*, embraces such of these boards as have been subjected to one or more of the aforesaid processes.

It would seem from the collector's timely answer to the protest, wherein he describes the involved merchandise as "Pulpboard, lined," that the issue in this case is the rather narrow one of whether the instant pulpboard is or is not lined. It is apparent, however, from the proof adduced on behalf of the defendant, and certain statements made by Government counsel, that the issue has been broadened to include the question of whether or not the involved merchandise has been plate finished.

In support of its contention that the merchandise is neither lined nor plate finished, counsel for the plaintiff introduced the testimony of Arthur C. Shafer, vice president of Mussman & Shafer, Inc., since the formation of that company in 1947. This witness testified at great length concerning every detail of the processes utilized by the foreign manufacturer in the production of hardboards of the kind imported by the plaintiff, which he had personally observed. In fact, he actually saw being produced some of the merchandise here in issue, a sample of which was introduced in evidence as plaintiff's exhibit 1. Although he himself was not a manufacturer of pulpboard or hardboard, and had spent not more than 48 hours in his inspection of the factory in Finland, Mr. Shafer had, for approximately 30 years, dealt with presses and other wood-working machinery. He was, therefore, able to, and did, give a very explicit and complete report of the manner in which the exporter converted portions of logs and other lumber into finished board.

The various processes as described by this witness first begin with the running of wood scraps, logs, short pieces of lumber, and otherwise unmerchantable portions of trees through a defibrator. This reduces the wood to very small chips, which are put into a retort, and, under steam and pressure, are further reduced to ordinary mechanical pulp,

or small wood fibers. The wet pulp comes down from the retort through a pipe leading into a lower floor in the factory building, and by force of gravity is fed or spread over a wire screen, in a layer or blanket. The screen which is very much like an ordinary bronze window screen, except for size, it being approximately 5 feet wide and more than 12 feet long, carries the blanket of wet pulp into a large press, which has 20 openings. While the screen is being conveyed from the feeder pipe to the press, it vibrates, causing a considerable portion of the water to drip from the wet pulp, and also causing the fibers to settle. The coarser, heavier, and larger fibers sink by nature of their own inherent weight to the bottom of the pile; the finer fibers float to and accumulate on top of the mass. One screen with its blanket of wet pulp is elevated into each of the openings in the press. Above each layer of pulp, and below the screen which supports it, are steel plates, approximately of the same dimensions as the screen, but about 2¾ inches thick. These plates had been drilled to permit steam to pass through the inner part of the plate and heat it, and had been machined to a uniform parallel thickness. When the press is filled with 20 screens, pressure is applied from the bottom, the plates are heated, and the pulp is mashed down into a sheet of hardboard, 20 separate sheets of hardboard resulting from each operation of the press. These are then placed in a steam room for normalizing. This process adds moisture and reduces the temperature of the product. It is then sawed to true dimensions, and crated, 12 sheets to a crate.

According to Mr. Shafer's observations, the pulpboard was not lined or coated on either side with a layer or sheet made from fine wood pulp, nor was any other type of lining used to produce it. The pulpboard was not laminated with any adhesive substance, nor surface stained, dyed, embossed, printed, calendered, plate finished, or decorated or ornamented in any manner. The rough side of exhibit 1 is caused by the impression of the screen which carried the pulp into the press opening; the flat polished surface thereof is created by the pressure of the top plate against the layer of pulp.

This witness also explained that although an examination of plaintiff's exhibit 1 might convey the impression that it is composed of separate sheets, in reality, it is one blanket layer of wet fiber, composed throughout of only one kind of pulp. However, the fibers of the pulp become interlaced, one with the other, and give the effect of separate sheets of paper that had been cemented together. Mr. Shafer stated further that after the importation of the merchandise at bar, the Savo Co. of Finland, the manufacturer herein, purchased from the Republic Steel Co. stainless steel plates to be used with the

drilled plates to produce a plate finished product, but that the additional plates were not used for the pulpboard here involved.

To counter this testimony on the part of the plaintiff, the defendant produced three witnesses. The first of these, James F. Jedlicka, the appraiser of merchandise at the port of Cincinnati, Ohio, was merely called for the purpose of establishing that he caused a sample of the merchandise to be sent to the Government chemist at Philadelphia for analysis.

At a hearing in Philadelphia, the chemist who made the requested analysis, after being duly qualified, testified that he ascertained by the use of a chemical stain, that the sample forwarded to him was composed of mechanical wood pulp; that he found it to consist of layers, which were not uniform in the sense that would result if several sheets of paper were placed one upon the other; that one surface of the board was hard and smooth, the other surface bearing the marks of wires; that by use of a microscope he examined the fibers from the top, the sides, and the under layers and found the fibers of the top layer to be shorter and finer than those on bottom. As a result of these findings, he concluded that the top portion is of a different quality mechanical wood pulp than the bottom.

George M. Syversen, manager of sales engineering for the Masonite Corp. of Chicago, Ill., was the third witness for the defendant. He produced three samples of hardboard or Masonite products manufactured by his company, which he identified, respectively, as Masonite Standard Prestwood, manufactured in the United States at Laurel, Miss., Masonite Tempered Prestwood, manufactured in Laurel, Miss., and Masonite Standard Prestwood, manufactured in Gatineau, Quebec, Canada. These were received in evidence as defendant's exhibits C, D, and E. When asked to compare these exhibits with defendant's exhibit B (another sample of the merchandise at bar), he stated that all of said boards appeared to be plate finished, as interpreted in the hardboard industry and that "Plate finishing in the hardboard industry is the type of surface obtained when the boards in the presses are forced against plates which, in turn, are backed up by platens which carry the heat into the press." After the testimony of plaintiff's witness Shafer describing the process of manufacture of the instant merchandise was read to him, Mr. Syversen stated that the process employed by his company was substantially similar to that of the foreign manufacturer, except that his company explodes the fiber instead of defibrating it; that whereas Mr. Shafer testified that the board was pressed directly against the object which Mr. Shafer called a plate, but which he calls a platen, in the Masonite process the pulp is pressed against plates which are attached to the platen and lie directly above the mass being formed

into board; and that pressing against the platen would not result in a smooth surface for the reason that the surface of the board reflects the surface against which it was pressed.

In the light of the testimony of plaintiff's witness Shafer, that no additional plates were attached to the plates which applied the pressure to the wet mass of wood pulp, and the definition of defendant's witness Syversen to the effect that plate finishing is obtained when the pulp is "forced against plates which, in turn, are backed up by platens which carry the heat into the press," we are unable to accept the latter's conclusion that the merchandise at bar was plate finished wallboard. That conclusion could only have been a surmise, predicated upon the appearance of the sample which the witness had before him. It cannot be reconciled with the uncontroverted statement in behalf of the plaintiff, based upon a personal observation of the entire process of manufacture, that no such plate, as would, in the opinion of the witness Syversen, ordinarily impart a plate finish, was employed in that process.

Moreover, we are of opinion that the terms "plate finished, supercalendered or friction calendered" as they appear in the Tariff Act of 1930 were intended by the Congress to refer to manufacturing processes over and above those which are essential to the initial production of the various boards enumerated in the provisions of the paragraph here under consideration. Were this not so, the language in paragraph 1402, *supra*, reading "Paper board, * * *; not plate finished, supercalendered or friction calendered" would be merely an empty expression, ineffectual and incapable of implementation.

In this conclusion, we are supported by the analysis of paragraph 1402 contained in Report No. 37 of the Committee on Finance, accompanying H. R. 2667 (which eventually became the Tariff Act of 1930). The committee there stated:

In paragraph 1402, which provides for nonprocessed paper-board, wall board, and pulpboard, including cardboard, and leatherboard or compress leather, the committee rephrased the processing terms employed with a view of eliminating ambiguities. No change in rates is made in this paragraph.

The terms "plate finished, supercalendered or friction calendered" are substituted for "glazed." The term "glazed" in this paragraph is used in a descriptive rather than a commercial sense. Administrative officials have been unable to determine the exact degree of gloss which is intended by the term "glazed." The terms "plate finished, supercalendered or friction calendered" are here used to indicate a gloss produced by a secondary process. These processes, generally speaking, are obtained by passing paper or board over one or a series of rolls sometimes of different materials, with or without heat, under pressure.

    *       *       *       *       *       *       *

Lined board under the present law is held to be board to the surface of which a liner, (outside or exposed layers), has been pasted after the board was manufactured. Vat-lined board is board to which a liner is applied in the form of a layer

of pulp at the time of manufacture in one process and is classified for duty as an unlined board. Vat-lined board competes in the trade with lined board, and the term "lined or vat-lined" is here used to indicate a board which has been lined by means of pasting or which has been produced in the form of a layer of pulp at the time of manufacture in one process.

The same terms used in paragraph 1402 to describe process boards are repeated in paragraph 1413.

In the Dictionary of Paper (1940), published under the auspices of the American Paper and Pulp Association, the following definitions are to be found:

Plate Finish.—A smooth or polished surface on sheets of paper, especially writing papers, produced by placing the sheets between polished plates of zinc or copper and passing a pile of these (called a "book") under high pressure and slight friction between the rollers of the plating machine. This finish varies greatly in degree, depending upon the pressure used and the number of times the book is passed through the plater, sometimes being a very flat finish without shine and sometimes being a very glossy finish. Many smooth or glossy finishes obtained by supercalendering are called plate finish and are indistinguishable from the finish obtained by the use of flat metal plates.

Plate-Finished Paper.—Any paper finished on a sheet plater. The finish may be a smooth or a fancy finish such as linen, ripple, or coarse finish.

Plater.—A machine for plate finishing which consists of two chilled-iron rolls, between which the form or book passes, forward and back, as the rolls reverse direction of turning; pressure is exerted only on the top rolls.

None of the foregoing expressions or definitions may fairly be said to describe a process which, as in this case, consists solely of the application of plate pressure to expel moisture and compress the remaining pulp into a completed board. That the incidental result of the pressure of the steel plates or platen to the material out of which the involved merchandise was formed was the creation of a smooth, slightly glazed outer surface is a matter which neither can nor should have any bearing upon the determination of whether or not that merchandise is plate finished. By virtue of the difficulty encountered by the customs officials in determining the degree of gloss intended by the term "glazed" in paragraphs 1302 and 1313 of the Tariff Act of 1922, the predecessor paragraphs of the present paragraphs 1402 and 1413, Congress has abandoned language interpreted by description in favor of phraseology directly indicative of precise processes applied. If, as is the case here, the step provided for in the paragraphs, to wit, plate finishing, has not been employed in producing the product before us, it is axiomatic that such product is not plate finished.

As to whether or not the instant board was lined, either subsequent to manufacture, or in the vat, the evidence adduced on the part of the plaintiff, to the effect that each board consisted solely of a single layer of pulp, with the finer, shorter fibers accumulating on top of

the layer as the result of the vibration of the screen is clearly sufficient to establish *prima facie* that it is not. It also serves to explain away the findings of the Government chemist. In view of the emphasis evident in defendant's proof upon the proposition that these importations were plate finished, and the absence of any affirmative showing that a lining in the form of a layer of pulp was superimposed upon the mass of pulp from which the hardboard in controversy was produced, we find that it has not been lined.

Upon the foregoing considerations, the claim of the plaintiff for classification of its merchandise within the provisions of paragraph 1402 of the Tariff Act of 1930, as modified by the trade agreements with Sweden and Finland, *supra*, and the consequent assessment of duty thereon at the rate of 10 per centum ad valorem is sustained.

Judgment will be entered accordingly.