**F. S. WHELAN & SONS**

v.

**UNITED STATES.**

C. D. 1706;

Protest Nos. 207771–K, 207772–K.

United States Customs Court
Second Division.
June 2, 1955.

Barnes, Richardson & Colburn, New York City (Eugene F. Blauvelt, New York City, of counsel), for plaintiff.

Warren E. Burger, Asst. Atty. Gen., Alfred A. Taylor, Jr., and Richard E. FitzGibbon, Trial Attys., New York City, for the defendant.

MacLeish, Spray, Price & Underwood, Chicago, Ill. (Robert C. Keck, Chicago, Ill., of counsel), amicus curiae.

Before LAWRENCE, RAO, and FORD, Judges.

RAO, Judge.

Two importations of so-called "Standard Hardboard, Industrial Grade," each consisting of 1,500 sheets, measuring 4' x 8' x 1/8", and 350 sheets, measuring 4' x 8' x 3/16", constitute the subject of the instant controversy. This merchandise was classified by the collector of customs at the port of entry as other pulpboard, plate finished, and assessed with duty at the rate of 7½ per centum ad valorem, pursuant to the provisions of paragraph 1413 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802.

Timely protests were filed against this decision of the collector alleging that the involved merchandise is properly dutiable at only 5 per centum ad valorem, as wallboard, not plate finished or otherwise processed, within the provisions of paragraph 1402 of the Tariff Act of 1930, as

modified by the Annecy Protocol to said General Agreement on Tariffs and Trade, 84 ·Treas.Dec. 403, T.D. 52373, supplemented by Presidential proclamation of April 27, 1950, 85 Treas.Dec. 116, T.D. 52462.

It now appears that the Government, although relying upon the collector's classification of the imported merchandise as plate finished pulpboard, urges alternatively, and by virtue of the provisions of paragraph 412 of the Tariff Act of 1930, as modified by said Annecy Protocol, supplemented by Presidential proclamation of May 13, 1950, 85 Treas.Dec. 138, T.D. 52476, that the hardboard in issue is properly dutiable at the rate of 16⅔ per centum ad valorem as manufactures of wood or bark, not specially provided for.

The tariff provisions pertinent to this proceeding are couched in the following language:

Paragraph 1402, supra, as modified:

"Paper board, wallboard, and pulpboard, including cardboard (but not including leather board or compress leather, and except strawboard, solid fiber shoe board and all counter board, and pulpboard in rolls for use in the manufacture of wallboard), not plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for:

    Wallboard and wet-machine board  *  *  *  .......... 5% ad val.
    Other ...................................... 7½% ad val."

Paragraph 1413, supra, as modified:

"Paper board and pulpboard, including cardboard and leatherboard or compress leather, plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, or decorated or ornamented in any manner:

    Pulpboard in rolls for use in the manufacture of wallboard, surface stained or dyed, lined or vat-lined, embossed, or printed .......................... 10% ad val.
    Other ..................................... $7.25 per ton of 2000 lb. but not less than 7½% nor more than 15% ad val."

Paragraph 412, supra, as modified:

"Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:
    .  *  *  *  *  *  *  *  *
    Other  *  *  *  ............................... 16⅔% ad val."

The two protests here under consideration were consolidated for the purposes of trial, and counsel for the respective parties have stipulated that the merchandise at bar, as represented by plaintiff's exhibit 1, a sample of the involved hardboard, in its condition as imported, except for size, was not supercalendered, friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, nor embossed, decorated, or ornamented in any manner. The omission to stipulate that it was also not printed was obviously an oversight, as the sample in evidence, as well as the description of the various processes by which it was produced, clearly demonstrates that the merchandise was not printed. It has also been agreed that wood fibers are the component material of chief value in the imported product.

It is the contention of plaintiff that the merchandise at bar is not provided for in paragraph 1413, as modified, supra, because it has not been plate finished nor subjected to any "secondary" process of manufacture; that it belongs to a class or kind of paperboard which was known and chiefly used as wallboard at and prior to the passage of the Tariff Act of 1930; and that, as it is *eo nomine* provided for in paragraph 1402, as modified, supra, the provision in paragraph 412, supra, for manufactures of wood can have no application.

In this, as in all customs litigation, the burden rests with the plaintiff to establish, first, that the collector has erroneously classified the merchandise under protest, and, second, that the imported product ought properly to be classified within the provisions alleged to include it. United States v. Gardel Industries, 33 C.C.P.A., Customs, 118, C. A.D. 325; Yardley & Co., Ltd. v. United States, 41 C.C.P.A., Customs, 85 C.A.D. 533; Joseph E. Seagram & Sons, Inc. v. United States, 30 C.C.P.A., Customs, 150, C.A.D. 227, and cases cited therein. As applied to the issues in this case, in the light of the provisions of said paragraphs 1402 and 1413, the classification of the collector, and the stipulation of the parties, before plaintiff could appropriately invoke the *eo nomine* provision for wallboard in said paragraph 1402, it was necessary to establish that the hardboard at bar was not pulpboard, plate finished. Since paragraph 1402, both as originally enacted, and as modified, provides for such wallboard only as has not been plate finished, any inquiry into the proposition of whether or not hardboard is of a class or kind of paperboard known and chiefly used as wallboard at and prior to June 17, 1930, remains of secondary consideration until the issue of whether or not the instant board has been plate finished is resolved. Then, but only if the answer is in the negative, does proof of characteristics and use as wallboard become relevant. Accordingly, we shall address ourselves first to what we have characterized as the primary issue, to wit, is the hardboard at bar, plate finished?

It appears from the record that the merchandise at bar was manufactured in the Sturgeon Falls mill of the Abitibi Power and Paper Co., Ltd., a Canadian corporation, hereinafter referred to as Abitibi, by a process which is the same or substantially the same as that employed by the Masonite Corp. and the Forest Fiber Products Co., both domestic concerns which manufacture hardboard, and that the domestic products "Masonite Standard Hardboard," represented by plaintiff's exhibit 16 and defendant's exhibit C, and "Forest Board," represented by defendant's exhibit E, are in all material respects the same as the Abitibi hardboard here in issue, as represented by plaintiff's exhibit 1.

Generally speaking, hardboard, as defined in this record, and in the patents of William H. Mason, its inventor and the guiding spirit of the Mason Fibre Co., the predecessor of Masonite Corp., is a hard, dense, grainless wood fiberboard composed of interfelted lignins cellulose fibers and having a specific gravity greater than most woods.

Abitibi's process of producing hardboard was described by Robert E. Costello, its assistant production manager, who supervises the Sturgeon Falls mill. Costello is a chemical engineer, a graduate of McGill University, with a background as control chemist and assistant paper mill superintendent with the Howard Smith Paper Mills at its Windsor Mills, Quebec, Canada. According to Costello, hardboard is produced by Abitibi in the following manner:

Hard wood and soft wood sticks are chipped into pieces with a conventional paper mill chipper. These are processed separately and stored separately until a somewhat later stage in the course of manufacture. The chips are forced into a preheater where, for a period of from 2 to 6 minutes, they are subjected to pressures ranging from 100 to 180 pounds per square inch and at corresponding temperatures. Some water is added. The application of heat and pressure softens the chips, which are then dropped into a refinery, where they are torn apart by revolving blades. A second refining brings the particle size to what the witness called "conventional pulp," a mixture of bundles of wood fibers and individual fibers.

At this point, the two types of pulp are combined and mixed, generally in proportions of 50 per centum each, and water is added. The combined pulps, after being thickened, are pumped up to the head box of the forming machine, mixed with water so that the proportions are approximately 1 per centum pulp fibers and 99 per centum water, and are allowed to flow over an endless wire mesh, a conventional Fourdrinier type of wire, approximately 5 feet wide and about 65 feet long. As the wire mesh moves with its blanket of pulp, the water slowly drains off. The pulp mixture passes under table rollers, through vacuum boxes, and between primary presses, where more water is drained off, and the sheet is compacted. When the pulp leaves the press section, it contains about 65 to 70 per centum of water and is in a form that can be handled by itself, that is, it will support its own weight. It is then cut into sheets, 16 feet 2½ inches in length. The wet pulp sheet is thereupon conveyed by means of a traveling screen into a press-loading mechanism, which has the capacity to store 20 such sheets. Then, the 20 sheets of wet pulp, on the 20 carrying screens, are pulled into a 20-deck upward acting press. When the press is loaded, it is closed, and the wet pulp sheets are subjected to pressures, ranging up to 600 pounds per square inch and steam of about 400 degrees Fahrenheit, until such time as all the water has been drained off and the sheets are bone dry. "The finished hardboard is made in that one single operation, * * *."

The press consists of 20 decks, composed of 21 steam platens or plates, each approximately 52 by 200 inches. The platens are of mild steel, welded together to form a hollow box, 3 inches thick, with internal passages created by bevels through which steam flows. Attached to the underside of the steam plates is a stainless steel caul plate, about ¼ inch thick, slightly larger in each dimension than the steam platen. Between the stainless caul plate and the underside of the steam platen is a section of wire mesh. The wet sheet of board is pressed between the carrying wire on its underside, and the stainless caul plate above it, and, when finished, reflects both surfaces against which it has been pressed. The bottom side, upon which is left the impression of the carrying wire, is referred to as screen backed. The top side has a smooth surface.

The purpose of the wire mesh between the stainless steel caul plate and the steam platen, as stated by Costello—

" * * * is to evenly distribute the heat being transmitted from the steam platen to the caul plate. Steam is admitted at one side and taken away at the other in the steam platen and you can have local hot spots, due to the use of the steam, and the wire mesh tends to evenly distribute the heat being received

332

from the steam platen between the caul plate."

In the closed position, the wire mesh tends to assist in evenly distributing the heat. In the open position, it tends to insulate the caul plate from the steam platen, so that when the press is closed the caul plate will be at a lower temperature than the steam platen, thus avoiding any tendency of the wet pulp to stick to the contacting surface.

According to Costello, the stainless steel caul plate is used because it is readily removable for cleaning and in case of damage, occasioned by any extraneous substance, such as a nut or bolt, for example, which might be carried into the press by the pulp. Without it, and in the event of damage, the steam plate itself would have to be removed, a costly and time-consuming operation. The pressing surface must be stainless steel to avoid corrosion from pressing woods with acids in them. Since the caul plate is a polished plate, the end result is "not a polished board but a smooth surface on the board" which, of course, is desirable. The smooth finish reduces the tendency to stick and prevents the steam from blowing out of low spots during the pressing operation.

By contrast, defendant's witnesses Robert M. Boehm and Orcutt W. Frost, both of whom had many years of experience in the wood fiber industry and were exceptionally well qualified to discourse upon the subject of hardboard, the former as Director of Development and Research for the Masonite Corp. and also on the staff of that company's long range planning, sales, engineering, and patent committees; the latter as general manager of the Forest Fiber Products Co., in charge of the manufacture and sale of Forest hardboard, were of opinion that it was not necessary in the manufacture of standard or untreated hardboard to make use of these additional plates. They are used for the purpose of imparting a smooth glossy finish to the boards because the trade requires a smooth surface. They also present a surface which is very resistant to abrasion, damage, or corrosion. Although Masonite uses in its press a precision ground mild steel plate, which is plated with chrome, this was stated to be a substantial equivalent of the stainless steel caul plate used by Abitibi. Witness Frost, whose company's process was to all intents and purposes copied by Abitibi for the manufacture of hardboard, stated that Abitibi's caul plate, plaintiff's exhibit 11, with which he was very familiar, had "what is known in the trade as #4 finish, which is a finish very close to that used on stainless steel mirrors," and that it is this plate which imparts the surface to the board.

In the opinion of witness Boehm, it is the wire screen between platen and plate which prevents the steam from blowing out of low spots during the pressing operation and reduces the tendency to stick. His testimony with respect to the purposes of the wire screen is as follows:

"A. One is to equalize the distribution of heat over the plate surface. If you leave the wire out, the portions directly under the steam corings will be hotter, sufficiently hotter to produce an effect on the board of streaks, which are called tiger stripes, and the wire distributes the heat over the plate and eliminates the tiger stripes. The second thing, it is impractical to keep water and fiber together between the platen and the plate. If there is no wire, you would temper the plates each time you came gradually up and the use of the wire doesn't temper the plates, and to some extent retards heat which helps prevent sticking.

"X. Q. You believe that in some measure it prevents sticking of the wet lap, it prevents the wet lap sticking to the hot plate?—A. Yes, sir."

Continuing further the description of the processes of manufacture, it appears that the bone-dry board, which is released from the press, is passed through a heating chamber to increase its strength and then through a humidify-

ing chamber to restore moisture and stabilize the board. Neither of these processes changes the appearance or surface of the board in any way. If, however, a stray drop of water touches the board and spots it, or if there are any surface defects found in the board, it is graded down from first quality or "dealer board" to "industrial board," which is what the instant merchandise is. Dealer grade board is cut into stock sizes of 4′ x 8′, 4′ x 12′, or 4′ x 4′, trimmed, and wrapped into bundles. Industrial board may be left in a 4′ x 16′ size or cut to 4′ x 8′ or other dimensions.

Also bearing upon the question of plate finishing is the testimony of plaintiff's witness Gordon I. Hoover, a doctor of philosophy in chemistry and technical director for various paper mills in Canada. Since 1930, he has been with the Provincial Paper Co., Ltd., a concern which manufactures some 200 classes of paper in the printing paper field. Dr. Hoover was in substantial agreement with the following definitions quoted from our opinion in the case of Mussman & Shafer, Inc. v. United States, 27 Cust.Ct. 28, C.D. 1343, and there stated to have been found in the Dictionary of Paper (1940), published under the auspices of the American Paper and Pulp Association:

"*Plate Finish.*—A smooth or polished surface on sheets of paper, especially writing papers, produced by placing the sheets between polished plates of zinc or copper and passing a pile of these (called a "book") under high pressure and slight friction between the rollers of the plating machine. This finish varies greatly in degree, depending upon the pressure used and the number of times the book is passed through the plater, sometimes being a very flat finish without shine and sometimes being a very glossy finish. Many smooth or glossy finishes obtained by supercalendering are called plate finish and are indistinguishable from the finish obtained by the use of flat metal plates.

"*Plate-Finished Paper.*—Any paper finished on a sheet plater. The finish may be a smooth or a fancy finish such as linen, ripple, or course finish.

"*Plater.*—A machine for plate finishing which consists of two chilled-iron rolls, between which the form or book passes, forward and back, as the rolls reverse direction of turning; pressure is exerted only on the top rolls."

His only modification thereof was to the effect that the "book" goes through considerable readjusting and motion between the metal plates, and the consequent slippage causes the paper to be polished. To the best of his recollection, the thickest piece of paper he had ever seen plate finished was 15 to 20-point board, that is, board 15 to 20 thousandths of an inch in thickness, whereas, 1/8-inch hardboard is equivalent to 125 thousandths of an inch.

Dr. Hoover was of opinion that the process in the press, as described by plaintiff's witness Costello, bore no resemblance whatsoever to the process of plate finishing as he has seen it. However, it is appropriate to point out that Dr. Hoover had never seen hardboard being made, nor had he ever seen a hot press in a hardboard plant.

Much other evidence and many exhibits were introduced into the record by the parties hereto, designed in part to establish the nature of wallboard, the similarity of the subject hardboard to wallboard, and its difference therefrom, and the uses of hardboard, such as that here involved, at and prior to June 17, 1930. We have carefully reviewed this evidence and examined all of the exhibits, but in view of the conclusion reached by us on the issues herein involved, as will appear, *infra*, no useful purpose would be served in detailing it at length.

Plaintiff relies upon our decision in the case of Mussman & Shafer, Inc., supra, in support of the contention that the hardboard at bar is not plate finished,

and the argument that this term in both paragraph 1402 and paragraph 1413 refers to a process secondary in point of time, applied to a material which has a preexistence *per se* as hardboard. It is urged that since "the smooth surface on one side of the imported board was created simultaneously with the creation of the board itself," and "the only material which came in contact with the plate was wet pulp *not yet* made into a board," [italics quoted] the imported board can not be said to have been plate finished.

We do not construe our decision in the cited case as authority for the secondary process doctrine, as expounded by counsel for plaintiff. The salient factor which led us to the conclusion that the hardboard there involved was not plate finished was the omission in the manufacturing process of any additional plate bearing resemblance to the caul plate of frequent reference in the instant record. After noting the subsequent purchase by the foreign manufacturer of "stainless steel plates to be used with the drilled plates to produce a plate finished product, but that the additional plates were not used for the pulpboard here involved," we had this to say in the Mussman & Shafer case:

"In the light of the testimony of plaintiff's witness Shafer, that no additional plates were attached to the plates which applied the pressure to the wet mass of wood pulp, and the definition of defendant's witness Syversen to the effect that plate finishing is obtained when the pulp is 'forced against plates which, in turn, are backed up by platens which carry the heat into the press,' we are unable to accept the latter's conclusion that the merchandise at bar was plate finished wallboard. That conclusion could only have been a surmise, predicated upon the appearance of the sample which the witness had before him. It cannot be reconciled with the uncontroverted statement in behalf of the plaintiff, based upon a personal observation of the entire process of manufacture, that no such plate, as would, in the opinion of the witness Syversen, ordinarily impart a plate finish, was employed in that process."

Then ensued the following observations:

"Moreover, we are of opinion that the terms 'plate finished, supercalendered or friction calendered' as they appear in the Tariff Act of 1930 were intended by the Congress to refer to manufacturing processes over and above those which are essential to the initial production of the various boards enumerated in the provisions of the paragraph here under consideration. Were this not so, the language in paragraph 1402, supra, reading 'Paper board, * *, not plate finished, supercalendered or friction calendered' would be merely an empty expression, ineffectual and incapable of implementation.

"In this conclusion, we are supported by the analysis of paragraph 1402 contained in Report No. 37 of the Committee on Finance, accompanying H.R. 2667 (which eventually became the Tariff Act of 1930). The committee there stated:

" 'In paragraph 1402, which provides for nonprocessed paper board, wall board, and pulpboard, including cardboard, and leatherboard or compress leather, the committee rephrased the processing terms employed with a view of eliminating ambiguities. No change in rates is made in this paragraph.

" 'The terms "plate finished, supercalendered or friction calendered" are substituted for "glazed." The term "glazed" in this paragraph is used in a descriptive rather than a commercial sense. Administrative officials have been unable to determine the exact degree of gloss which is intended by the term "glazed." The terms "plate finished, supercalendered or friction calendered" are here used to indicate a gloss produced by a secondary proc-

ess. These processes, generally speaking, are obtained by passing paper or board over one or a series of rolls sometimes of different materials, with or without heat, under pressure.' "

Taken in context, it is apparent that the language "manufacturing processes over and above those which are essential to the initial production of the various boards enumerated in the provisions of the paragraph here under consideration," obviously refers to processes additional to those essential to any production of boards, not secondary in point of time, but secondary only as regards necessity. If hardboard can be produced without equipment which imparts a plate finish, and the cited case as well as the instant record so indicates, then its production with the use of such equipment necessitates the conclusion that it has been plate finished within the meaning of that term, as used in the paragraphs in question. Since the use of a polishing plate is here affirmatively shown, classification within the provisions of paragraph 1402, as modified *supra*, as wallboard, not plate finished, is precluded, and the claim of the plaintiff for that relief must be denied.

Moreover, by virtue of the phraseology which is a part of the provisions here in question, it must be accepted as established fact that pulpboard, whatever its thickness, is a substance susceptible of plate finishing. It does no violence to the dictates of sound reason and logic to admit of the probability that the process of plate finishing employed in the pulpboard industry can and does differ from that process as applied to paper. In any event, what the precise nature of the process is we do not consider to be material. The object of the legislature was to provide for a higher rate of duty upon pulpboard having a gloss produced by a secondary process. The hardboard before us meets that description.

We turn now to the alternative claim of the Government for classification of the instant merchandise within the provisions of paragraph 412, as modified, supra, as manufactures of wood or bark, not specially provided for. This contention is advanced in the brief of the Government as an alternative in the event that this court finds that the merchandise at bar is not plate finished. Having found otherwise, we would normally be disposed to overrule this contention without further consideration. However, *amicus curiae*, who has also briefed this proposition, strongly urges that hardboard is neither paperboard nor pulpboard, within the meaning of either paragraph 1402 or paragraph 1413, and, not being elsewhere provided for, should properly have been classified as a manufacture of wood.

In the brief of *amicus curiae*, it is stated:

" * * * These terms [paper board and pulpboard] were also described in the Summary of Tariff Information, 1929, compiled by the United States Tariff Commission for use by the House Committee On Ways And Means, where (p. 1813) 'paperboard' was described as follows:

" 'Paper board is a general term embracing a class of papers manufactured on a multi-cylinder or wet machine. Waste paper (largely newspaper), straw, rags, and the lower grades of wood pulp are the chief raw materials used. Paper board is stiff, of greater weight than other kinds of paper, and for tariff purposes not less than nine one-thousandths of an inch in thickness. The principal use of paper board is in the manufacture of paper boxes and other containers. It is also used for sheathing, binding books, printing, trunks, suitcases, shoes, tags, railway advertising cards, placards, etc.'

"Standard treatises available in 1930 defined 'paperboard' as a kind of 'cardboard or pasteboard,' and defined 'pulpboard' as 'rough or crude paperboard or cardboard.' 'Classification & Definitions of Paper,' C.

J. West (1928), defined 'pulpboard' as—

" 'A term referring to a kind of board, made on a multi-cylinder machine from mixed papers and mechanical pulp; may be a combination (filled) or solid.

" 'a. Combination pulpboard is a board having a base or center of mixed papers, with a vat-liner on both sides made from Manila clippings or mechanical pulp.

" 'b. Solid pulpboard is a board made entirely of mechanical pulp.'

"Webster's New International Dictionary (published January 1, 1927) defines 'pulpboard' as 'Paper board made directly from pulp. Cf. "Pasteboard." ' (p. 1724) It defines the word 'paperboard' as 'Pasteboard' and the words 'Paper boards' as 'Bookbinding. Boards with the outside covering of paper.' (p. 1560) Funk and Wagnalls, New Standard Dictionary of the English Language (1930), defines 'pulpboard' as 'Board manufactured directly from pulp.' (p. 2007) and 'Paper boards' as '(Bookbinding) boards covered with paper.' (p. 1786)"

We are not able to conclude from the record before us that hardboard is something other than pulpboard, as hereinabove defined. Granted its properties differ in certain essentials from those of other paper or pulpboards, as noted so clearly in the case of Masonite Corporation v. Celotex Co., 3 Cir., 66 F.2d 451, an action for the infringement of hardboard patents owned by the Masonite Corp., nevertheless, it is fiberboard made directly from mechanical pulp and thus meets squarely many of the definitions we are asked by counsel to consider.

We do not feel that there is sufficient evidence in this record to overcome the presumption inherent in the collector's classification that the merchandise at bar is pulpboard. Accordingly, we hold that it was properly classified in paragraph 1413, *supra*, as modified, as pulpboard, plate finished.

In view of the foregoing considerations, all claims in the protests are overruled. The alternative contention of the defendant is likewise deemed without merit.

Judgment will be entered accordingly.