(C. D. 1982)

F. S. Whelan & Sons *v.* United States

United States Customs Court, Second Division

(Decided April 17, 1958)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.
*Robert C. Keck* as *amicus curiae*.

Before Lawrence, Rao, and Ford, Judges; Ford, J., concurring in part; dissenting in part

Rao, Judge: The question for determination in this action is the proper dutiable classification, within the framework of existing tariff provisions, of certain so-called "Standard Hardboard, Industrial Grade," hereinafter referred to as hardboard. This merchandise was imported from Canada in sheets, 4 feet in width, 8 feet in length, and of a thickness of either ⅛, ³⁄₁₆, or ¼ inch, with the ⅛-inch thickness predominating.

The collector of customs at the port of entry classified the importations as pulpboard, plate finished, and assessed duty thereon, at the rate of 7½ per centum ad valorem, pursuant to the provisions of paragraph 1413 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

It is the sole claim of plaintiff that the involved hardboard falls within the provisions of paragraph 1402 of said tariff act, as modified by the Annecy Protocol to said General Agreement on Tariffs and Trade, 84 Treas. Dec. 403; T. D. 52373, supplemented by the Presidential proclamation of April 27, 1950, 85 Treas. Dec. 116, T. D. 52462, for wallboard, not plate finished or otherwise processed, and, accordingly, is dutiable at the rate of 5 per centum ad valorem.

While specifically disclaiming a repudiation of the collector's classification of hardboard as pulpboard, plate finished, the Government here advances, and heavily relies upon, the alternative proposition that hardboard is neither pulpboard, nor any other product provided for in said paragraph 1413, as modified, *supra*, and that the proper classification of such merchandise is as a manufacture of wood, not specially provided for, dutiable at the rate of 16⅔ per centum ad valorem, by virtue of the provisions of paragraph 412 of said tariff act, as modified by said Annecy protocol, supplemented by the Presidential proclamation of May 13, 1950, 85 Treas. Dec. 138, T. D. 52476. In this approach, counsel for the Government is supported by *amicus curiae* who appears herein in behalf of domestic hardboard interests.

The foregoing tariff provisions read as follows:

Paragraph 1402, *supra*, as modified:

Paper board, wallboard, and pulpboard, including cardboard (but not including leather board or compress leather, and except strawboard, solid fiber shoe board and all counter board, and pulpboard in rolls for use in the manufacture of wallboard), not

plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for:

    Wallboard and wet-machine board \* \* \*_____ 5% ad val.

Paragraph 1413, *supra*, as modified:

Paper board and pulpboard, including cardboard and leather board or compress leather, plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, or decorated or ornamented in any manner:

    Pulpboard in rolls for use in the manufacture of wallboard, surface stained or dyed, lined or vat-lined, embossed, or printed_____ 10% ad val.

    Other_____ $7.25 per ton of 2000 lb., but not less than 7½% nor more than 15% ad val.

Paragraph 412, *supra*, as modified:

Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:

    \*       \*       \*       \*       \*       \*       \*

    Other \* \* \*_____ 16⅔% ad val.

The issues as thus posed were before this court for consideration in the case of *F. S. Whelan & Sons* v. *United States*, 34 Cust. Ct. 208, C. D. 1706, in respect to identical merchandise, manufactured by the same Canadian exporter, the Abitibi Power and Paper Co., Ltd., hereinafter referred to as Abitibi, and previously imported by plaintiff. In effect, this is a retrial of the question of how hardboard should be classified, and the record in the decided case forms part of the record before us.

Much additional testimony and numerous exhibits have been introduced into evidence, but the basic issues remain the same. They are whether hardboard is pulpboard, plate finished; wallboard, not plate finished; or, responding to neither description, is covered by the catchall provision for manufactures of wood.

At the outset, we deem it pertinent to observe that wallboard is not specified by name anywhere in the language of paragraph 1413, as originally enacted, or as modified by applicable trade agreement provisions. Wallboard as an enumerated tariff commodity is found only in paragraph 1402, *supra*, but is there limited to such as has not been subjected to any of the processes described in the provision.

Since, by stipulation or otherwise, all of said processes, with the exception of plate finishing, have been removed from the court's consideration, so far as here pertinent, it is proper to state that the provision which plaintiff has invoked is for wallboard, not plate finished. There is no other kind of wallboard *per se* provided for in existing tariff law.

If, as we have held in the incorporated case, the subject hardboard is plate finished, plaintiff can not prevail in this action, regardless of whether or not hardboard belongs to a class or kind of merchandise known and chiefly used as wallboard at and prior to the time the present tariff act became law. And since paragraph 1413 contains no provision for wallboard, an adherence to that conclusion must render irrelevant much of the vast body of evidence in this case concerning the similarity or difference between hardboard and wallboard.

On the other hand, if it be here determined, contrary to our former conclusion, that hardboard of the kind before us is not plate finished, the question of whether or not hardboard falls within the scope of the term "wallboard" necessarily arises.

In either event, it is important to know what hardboard is, and how it is made. In the incorporated case, we defined hardboard as follows:

Generally speaking, hardboard, as defined in this record, and in the patents of William H. Mason, its inventor and the guiding spirit of the Mason Fibre Co., the predecessor of Masonite Corp., is a hard, dense grainless wood fiberboard composed of interfelted lignins cellulose fibers and having a specific gravity greater than most woods.

Since it appears from the instant record that Abitibi's processes for manufacturing hardboard have remained constant, we quote the description thereof from our prior decision. It was there stated:

Hard wood and soft wood sticks are chipped into pieces with a conventional paper mill chipper. These are processed separately and stored separately until a somewhat later stage in the course of manufacture. The chips are forced into a preheater where, for a period of from 2 to 6 minutes, they are subjected to pressures ranging from 100 to 180 pounds per square inch and at corresponding temperatures. Some water is added. The application of heat and pressure softens the chips, which are then dropped into a refinery, where they are torn apart by revolving blades. A second refining brings the particle size to what the witness called "conventional pulp," a mixture of bundles of wood fibers and individual fibers.

At this point, the two types of pulp are combined and mixed, generally in proportions of 50 per centum each, and water is added. The combined pulps, after being thickened, are pumped up to the head box of the forming machine, mixed with water so that the proportions are approximately 1 per centum pulp fibers and 99 per centum water, and are allowed to flow over an endless wire mesh, a conventional Fourdrinier type of wire, approximately 5 feet wide, and

about 65 feet long. As the wire mesh moves with its blanket of pulp, the water slowly drains off. The pulp mixture passes under table rollers, through vacuum boxes, and between primary presses, where more water is drained off, and the sheet is compacted. When the pulp leaves the press section, it contains about 65 to 70 per centum of water, and is in a form that can be handled by itself, that is, it will support its own weight. It is then cut into sheets, 16 feet 2½ inches in length. The wet pulp sheet is thereupon conveyed by means of a traveling screen into a press-loading mechanism, which has the capacity to store 20 such sheets. Then, the 20 sheets of wet pulp, on the 20 carrying screens, are pulled into a 20-deck upward acting press. When the press is loaded, it is closed, and the wet pulp sheets are subjected to pressures, ranging up to 600 pounds per square inch and steam of about 400 degrees Fahrenheit, until such time as all the water has been drained off and the sheets are bone dry. "The finished hardboard is made in that one single operation, * * *."

The press consists of 20 decks, composed of 21 steam platens or plates, each approximately 52 by 200 inches. The platens are of mild steel, welded together to form a hollow box, 3 inches thick, with internal passages created by bevels, through which steam flows. Attached to the underside of the steam plates is a stainless steel caul plate, about ¼ inch thick, slightly larger in each dimension than the steam platen. Between the stainless caul plate and the underside of the steam platen is a section of wire mesh. The wet sheet of board is pressed between the carrying wire on its underside and the stainless caul plate above it, and, when finished, reflects both surfaces against which it has been pressed. The bottom side, upon which is left the impression of the carrying wire, is referred to as screen backed. The top side has a smooth surface.

*　　　*　　　*　　　*　　　*　　　*　　　*

Continuing further the description of the processes of manufacture, it appears that the bone-dry board, which is released from the press, is passed through a heating chamber to increase its strength and then through a humidifying chamber to restore moisture and stabilize the board. Neither of these processes changes the appearance or surface of the board in any way. If, however, a stray drop of water touches the board and spots it, or if there are any surface defects found in the board, it is graded down from first quality or "dealer board" to "industrial board," which is what the instant merchandise is. Dealer grade board is cut into stock sizes of 4' x 8', 4' x 12', or 4' x 4', trimmed, and wrapped into bundles. Industrial board may be left in a 4' x 16' size or cut to 4' x 8' or other dimensions.

Predicated upon what we regarded as convincing evidence that hardboard can be produced without the use of the so-called stainless steel caul plates; that such plates, which have a No. 4 finish similar to that of stainless steel mirrors, are used to impart a smooth glossy surface to hardboard; that being a requirement of the trade which purchases it, and actually do accomplish that purpose, we held that the hardboard before us in the incorporated case was plate finished. It was our view that it was the intention of Congress (as expressed in Report No. 37 of the Committee on Finance to accompany H. R. 2667, which eventually became the Tariff Act of 1930) in phrasing paragraphs 1402 and 1413 to impose a higher rate of duty upon pulpboard having a gloss produced by a secondary process, that is, secondary from the point of view of necessity rather than from the

point of view of a subsequent process applied to a preexisting material, and that no specific process designed to create the gloss is dictated.

This conclusion was reached, despite testimony of plaintiff's paper expert, Dr. Gordon I. Hoover, that plate finishing, as a term applied to paper and paper boards, not over 20 thousandths of an inch in thickness, meant a process of imparting a smooth or polished surface "by placing the sheets between polished plates of zinc or copper and passing a pile of these (called a 'book') under high pressure and slight friction between the rollers of the plating machine." See Dictionary of Paper, 1940 edition, published under the auspices of the American Pulp and Paper Association. Concerning Dr. Hoover, we noted, in passing, that he had never been in a hardboard factory and had never seen hardboard being made.

In the present case, plaintiff again contends that the instant hardboard is not plate finished and suggests that the court apparently misconstrued the function and nature of the caul plates in the hydraulic press. It is asserted that the purpose and function of the plates and of the bronze wire screens which separate the plates from the steam platens were to make a better hardboard, not to polish its surface, and that, since the boards were not subjected to any secondary process to give it a gloss, they are not plate finished.

Two witnesses, in addition to Dr. Hoover, were called by plaintiff to give evidence on the subject of plate finishing. They were Edson A. Ferrell, for 47 years in the finishing department of the Strathmore Paper Co. of Springfield, Mass., a manufacturer of Bristol board for artist's use, and Dan T. Quirk, president of Peninsular Paper Co., whose principal products were cover paper and printing paper in general. These witnesses, who were familiar with plate finishing of paper and paper board during the years 1929 and 1930, but not with pulpboard, and had never seen hardboard manufactured, were of opinion that plate finishing could only be achieved with the use of a plater, as illustrated by plaintiff's exhibit 36, in a process of the type described by witness Hoover, in which process friction caused by slippage of the "book" between the rollers is essential.

Neither thought that hardboard, as represented by plaintiff's exhibit 1, was plate finished, because it did not have a glossy surface; because it was not possible to plate finish only one side of paper, and have the other side as rough and corrugated as the screen-backed side of exhibit 1; and because their mills were not equipped to plate finish unpressed wood pulp mats containing 65 to 70 per centum of moisture.

It is significant, however, that standards at Ferrell's mill call for a very high degree of gloss—an attempt is made to obtain a maximum

gloss of 72 per centum, when measured by a Bausch & Lomb glarimeter, an instrument designed to indicate light reflex or gloss, and less than 52 per centum would not be considered acceptable to the trade with which it deals. Moreover, there are finishes by plate, which he would not consider "plate finished," for the reason that they do not carry the percentage of gloss that is required by his company's trade in general. As admitted by this witness, paper finished by plate on the same machine would be considered plate finished or not, depending upon the percentage of gloss.

It is obvious that Ferrell's views on the subject of plate finishing are colored by the very high quality of paper which his company sells, to wit, artists' paper, wedding announcements, and cards, and do not reflect the standards contemplated by Congress for the term in question.

Witness Quirk, when shown plaintiff's exhibit 11, a section of the caul plate used in Abitibi's hot press, stated, on cross-examination:

Not this particular piece of steel or whatever it is, but certainly this type apparently very smooth material would be ideal to use as a matrix to put a plate finish on paper.

That he qualified this statement on redirect examination by testifying that plaintiff's exhibit 11 was too thick and rigid to be used to plate finish, does not detract from the essential admission that a metal plate with a very smooth surface has the capacity to impart that quality to another substance.

Plaintiff also recalled Dr. Hoover, who had, during the interval since the first trial, visited Abitibi's hardboard mill at Sturgeon Falls. He reiterated his former testimony that the only process of plate finishing that he recognized was to put together alternate sheets of zinc and paper, until a suitable thickness was obtained, and then to process the result, called a book, between the two rollers of a plater. He further stated that a lateral motion is essential in plate finishing and that he saw no lateral motion in the hardboard press at Abitibi's mill.

Dr. Hoover tested several samples of paper board, in evidence as plaintiff's exhibits 34, 35, and 37, as well as plaintiff's exhibit 1, to determine their smoothness by ascertaining the rate of air leak past the surface. He found that exhibit 35, an admittedly plate finished paper board, tested 180°, whereas exhibit 34, a paper board not plate finished, exhibit 37, a piece of paper board like exhibit 34, which Dr. Hoover had pressed against a smooth stainless steel caul plate, under pressure of 600 pounds per square inch, but no extraneous heat, and plaintiff's exhibit 1 tested 3½°, 2°, and 4½°, respectively. His conclusion was that exhibit 1 was not plate finished.

Several factors militate against attaching great weight to the

results of Dr. Hoover's tests. In the first place, he readily admitted that a product could be very smooth, measure 180°, and still not be plate finished. Secondly, his statement that the air-leak method of testing smoothness was generally accepted in the trade by the technical association of the pulp and paper industry, as standard, has not only been challenged by defendant's witness Robert M. Boehm, an outstanding authority in both the "paper" and the "hardboard" fields, but has not been shown to be an effective method for ascertaining the amount of gloss on hardboard. Notwithstanding Dr. Hoover's brief visit to a hardboard mill, he had no real experience in the manufacture and testing of hardboard. Thirdly, Hoover characterized the tests as designed to measure smoothness rather than actual gloss. And, finally, as indicated by Senate Finance Committee Report No. 37, it was the difficulty in ascertaining degrees of gloss intended by the term "glazed" in paragraph 1302 of the Tariff Act of 1922, which prompted Congress to substitute therefor the terms "plate finished, supercalendered or friction calendered."

It is our view that plaintiff's evidence concerning plate finishing in the instant case is cumulative of its original proof of the specific process of plate finishing which obtains in the paper and paper board industries. It does not require a departure from our previous finding that the hardboard at bar is plate finished.

Regardless of whether or not the caul plates are employed in the hot press for the purpose of producing a better product, the fact is that hardboard can be produced without the use of such plates. The new evidence does not controvert the essential fact that when the stainless steel caul plates are used their primary purpose is to create a smooth, glossy finish on the boards, and that when the boards are pressed against the plates they take their finish from the plates.

There are in the record as presently constituted many advertising circulars of the Masonite Corp., the original producer of hardboard, of the Abitibi Co., and of certain other American manufacturers of hardboard, all of which emphasize as a desirable characteristic the smooth surface which standard hardboard possesses. See for example, plaintiff's collective exhibit 23, plaintiff's exhibits 25, 42, and 43; defendant's exhibits F, G, H, and L. Abitibi describes its product as having a "hard, satin finish." (Defendant's exhibit F.) Smoothness is a characteristic demanded by the trade which uses the product, and is purposefully imparted to the product to meet that demand.

We adhere to the conclusion that the instant hardboard is plate finished, and, in so doing, necessarily overrule plaintiff's claim for classification of this merchandise within the provisions of paragraph 1402, as modified, *supra*, for wallboard, not plate finished.

There remains for consideration the alternative contention inter-

posed by defendant and asserted by *amicus curiae* that hardboard is not a pulpboard; is not provided for by name in the Tariff Act of 1930, or any applicable trade agreement modifications thereof; and is, therefore, properly classifiable within the provisions of paragraph 412, *supra*, for manufactures of wood, not specially provided for.

The argument proceeds upon the theory that hardboard is distinguishable from all paper and paper products, in that it retains all of the structural elements of wood held together by the lignins, the natural binder which holds them together in wood, whereas, in the production of paper, much of the lignin content is purposely removed and the cellulose fibers are felted together, without the consolidating heat and pressure, which are requisites for the production of hardboard. It is asserted that hardboard is produced from wood fiber, not from wood pulp, is subjected to processes of manufacture which do not resemble those for making paper or paper products, is characterized by a high wet strength, accompanied by a capacity to absorb some water, and, unlike paper, will not revert to its constituent fibers in the presence of water.

We need not dwell at length, as counsel have done, upon the proposition that hardboard is a manufacture of wood. Counsel for the plaintiff has conceded, and the record amply establishes, that wood fiber is the component material of chief value in hardboard. The natural fibers in the wood are, in the process of manufacture, separated from each other, put together in heterogeneous alignment, and compacted under combined heat and pressure into a dense, grainless synthetic wood board. It differs from wood in its name, in its character, and in many of its uses, and were there no more in the case than this, under well-settled principles of law, hardboard could find appropriate classification within the basket provision for manufactures of wood. *Goldman* v. *United States*, 87 Fed. 193; *Nairn Linoleum Co.* v. *United States*, 151 Fed. 955; *Lang et al.* v. *United States*, 4 Ct. Cust. Appls. 464, T. D. 33881; *H. Muehlstein & Co., Inc.*, and *F. L. Kraemer & Co.* v. *United States*, 37 Cust. Ct. 108, C. D. 1806, affirmed 44 C. C. P. A. (Customs) 107, C. A. D. 645.

The question is, however, whether hardboard is that kind of wood product for which Congress has made other provision in the tariff law.

Tariff acts are written in the language of commerce, which is presumptively that in common use. *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436. "It is not reasonable to assume that the Congress had in mind any fine technical distinctions, such as men of science might draw, * * *." *Bakelite Corporation et al.* v. *United States*, 16 Ct. Cust. Appls. 378, T. D. 43117; *Hummel Chemical Co.* v. *United States*, 29 C. C. P. A. (Customs) 178, C. A. D. 189. Accordingly, connotations having special significance to the

scientist for determining the chemical composition and physical properties of a product are not always material in ascertaining the common meaning of terms employed by the Congress.

It is equally well established that the common meaning of statutory language is that which obtained at the time when the words used were incorporated into the law. *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913; *United States* v. *O. Brager-Larsen*, 36 C. C. P. A. (Customs) 1, C. A. D. 388.

What did the words "pulp" and "pulpboard" mean when used by Congress in 1930?

Webster's New International Dictionary, 1927 edition, contains the following definitions:

**pulp,** *n.* **1.** A moist, slightly cohering mass, consisting of soft, undissolved animal or vegetable matter. Specif. * * * **d.** The material of which paper is made when ground up and suspended in water.

**pulpboard,** *n.* Paper board made directly from pulp. Cf. PASTEBOARD, 1.

**pasteboard,** *n.* **1.** A stiff material made by pasting several sheets of paper one upon another; hence, loosely, any kind of paper board, as that made by the union of thin layers of paper pulp or by pressing pulp into molds. * * *

In Funk & Wagnalls New Standard Dictionary of the English Language, 1927 edition, we find the following:

**pulp,** *n.* **1.** A moist, soft, slightly cohering mass of matter, usually organic. **2.** Specif. * * * (4) A mixture, as of wood-fibers or rags, reduced to a pulpous condition, and forming the basis from which paper is made.

**p.-board,** *n.* Board manufactured directly from pulp.

We think these definitions fairly indicate that Congress, in employing the term "pulpboard," had in mind a board made directly from wood pulp, and most assuredly was not concerned with any particular processes of manufacture nor any special properties such board might possess.

The present record is replete with testimony purporting to establish a difference between hardboard, on the one hand, and paper board, wallboard, and pulpboard, on the other, predicated upon differences in the length and structure of the fiber content, the way in which the fibers are separated, the bonding element which holds the fibers together, the methods of manufacture, the physical properties, as determined by a great variety of specialized tests (defendant's collective exhibit N), and the uses to which these products are adapted. To the extent, however, that this evidence is designed to show that hardboard is a product excluded from the common meaning of the word "pulpboard," it derives from a very narrow interpretation of the basic term "wood pulp." Thus, in the instant record, both Robert M. Boehm, and Armin Elmendorf, whose outstanding qualifications as wood technologists and experts in the field of hardboard we do not question,

carefully endeavored to preserve a distinction between wood pulp, from which they admitted pulpboard is made, and slurry, or wood fiber suspended in water, from which hardboard is made. In Boehm's words, in the instant record, "Wood pulp is made from wood and wood fiber is made from wood, but they are not synonymous." In Elmendorf's "pulpboard is a product made of pulp suitable for the manufacture of paper. The term pulp is a trade name applying to that product out of which paper in some form is made."

Insofar as witness Elmendorf is concerned, no more need be said than that he admittedly has confined his definition to a trade understanding, not shown to be uniformly, generally, and definitely accepted in any class of trade. Boehm's testimony at the second trial seems to be somewhat different from that given at the first, wherein he stated:

Q. You mean the wood fibers and the wood fiber bundles?—A. Yes, the wood fibers and the wood fiber bundles are mixed with water to form a slurry.

Q. You have used the term fiber slurry, will you explain that?—A. That is the suspension of wood fibers and wood fiber bundles in water.

Q. Would that be referred to sometimes as pulp?—A. In the hard board industry, we normally speak of it not as pulp, but as slurry. However, the definition of pulp is that it is fibers suspended in water, either individual fibers or fiber bundles, and under that definition, it may be called pulp.

\*　　\*　　\*　　\*　　\*　　\*　　\*

X Q. Mr. Boehm, when you described the process of making your hard board, you testified that you had wood fibers in suspension in water; about 99% water and 1% fiber in the head box before it flowed down on the Fourdrinier——A. I said 2% fibers and 98% water.

X Q. Excuse me, isn't that the essential beginning of all paper making and pulp making; don't they all start from that same point?—A. Not all pulp making.

X Q. Well, is it the first step in all paper making speaking generally?—A. To start paper making you would have to have a dilute wood fiber or other fibers in water, but it isn't necessarily a Fourdrinier machine.

X Q. But you do start with a dilute solution of fibers of some sort?—A. Yes, sir.

X Q. In paper making?—A. Yes, sir.

X Q. And when you make it from wood, they are wood fibers which have by some means or methods been separated into individual fibers as far as you can get them?—A. Yes, sir.

X Q. This is basic, and it may seem silly to you, but in the manufacture of paper generally, is a felting of these fibers into a mat necessary?—A. Yes, sir.

X Q. On a screen of some sort?—A. Yes, sir.

X Q. And in felting the purpose is to get as many fibers at right angles to each other as you can, is it not? To add strength to your paper, is it not?—A. You want a heterogeneous distribution of fibers, you don't care whether they are at right angles or not.

X Q. But you don't want them lying parallel to each other?—A. No, sir.

X Q. And that is the same object that you have in making the wet lap which later becomes the hard board?—A. Yes, sir.

X Q. In the wood pieces or in the saw-mill ends of lumber, or in logs from which the chips came, they were more or less parallel to each other in their natural state, were they not?—A. Yes, sir.

X Q. They were held together, bonded together by natural lignins, were they not?—A. Yes, sir.

X Q. And your object first is to dissolve or to break those fibers apart?—A. Not to dissolve.

X Q. I didn't mean to dissolve, I will ask that that be stricken out, I mean to loosen the fibers that were held together?—A. Yes, sir.

X Q. And you achieved that by the explosion in your case of the chips?—A. Yes, sir.

X Q. The fibers in the finished hard board are interlaced and felted in the same relative position to each other as in the wet lap that goes into the press, are they not?—A. Yes, sir.

Accepting, as we must, the definition of pulpboard as a board made directly from mechanical pulp, we are not convinced that there is any material difference between ordinary ground wood pulp of the type used in major proportions in newspaper production, and Abitibi's defibrated pulp or Masonite's exploded pulp. The element which is largely desired in hardboard manufacture, the lignin content of the fiber, is, as is established by this record, likewise retained in wood that is ground into pulp by other mechanical means. Neither do we believe that Congress had any such distinction in mind when it provided, in paragraphs 1402 and 1413 of the Tariff Act of 1930, for pulpboard.

It may well be that, by virtue of the special characteristics, properties, and uses of hardboard, Congress might now be inclined to set up a separate classification of the product and distinguish it from the pulpboards, which are provided for in said paragraphs. But the function of this court is to interpret and not to legislate—to construe the language of the tariff laws as they are written, bearing in mind that the master rule in the construction of statutes is to so interpret them as to carry out the legislative intent. *L. R. Markell et al.* v. *United States*, 16 Ct. Cust. Appls. 518, T. D. 43239; *United States* v. *United Geophysical Company*, 38 C. C. P. A. (Customs) 137, C. A. D. 451. It is our considered opinion that Congress intended to encompass within the term "pulpboard" all boards made directly from mechanical pulp, without regard to any other considerations. As we have held that both defibrated and exploded pulp, from which hardboard is made, are types of mechanical pulp, it necessarily must follow that hardboard is pulpboard, and the collector properly so classified it.

Based upon the foregoing considerations, we overrule all claims in the protest and hold the alternative contention of the defendant and *amicus curiae* to be without merit.

Judgment will be entered accordingly.

FORD, Judge, concurring in part and dissenting in part: I concur in the majority holding that the merchandise in the above-stated case is not a manufacture of wood and quote the following from *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, 43 L. ed. 139, in support of that conclusion:

> The primary meaning of the word "manufacture" is something made by hand, as distinguished from a natural growth; but as machinery has largely supplanted this primitive method, the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily., the article so manufactured takes a different form, or at least subserves a different purpose from the original materials; and usually it is given a different name. Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window sashes, trimmings, and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name.
>
> The material of which each manufacture is formed, and to which reference is made in § 3019, is not necessarily the original raw material—in this case the tree or log—but the product of a prior manufacture; the finished product of one manufacture thus becoming the material of the next in rank. This case, then, resolves itself into the question whether the materials out of which these boxes were constructed were the boards which were manufactured in Canada or the hooks which were imported into the United States.

When the observations in the above quotation are applied to the facts in this case, their controlling effect is readily apparent.

On the question of whether the subject merchandise is "plate finished," I am not in agreement with the majority opinion that the plaintiff has failed to establish that it is not "plate finished," within the meaning of the two paragraphs here involved.

In the original decision of the issue here presented, reported in 34 Cust. Ct. 208, C. D. 1706, in which I joined, after detailing the various steps employed in the manufacture of the merchandise there in issue, the decision concludes with the following statement: "The finished hardboard is made in that one single operation."

In Report No. 37 of the Senate Finance Committee on H. R. 2667, which eventually became the Tariff Act of 1930, the following appears:

> In paragraph 1402, which provides for nonprocessed paper board, wall board, and pulpboard, including cardboard and leatherboard or compress leather, the committee rephrased the processing terms employed with a view of eliminating ambiguities. No change in rates is made in this paragraph.
>
> The terms "plate finished, supercalendered or friction calendered" are substituted for "glazed." The term "glazed" in this paragraph is used in a descriptive rather than in a commercial sense. Administrative officials have been unable to determine the exact degree of gloss which is intended by the term "glazed." The terms "plate finished, supercalendered or friction calendered" are here used to indicate a gloss produced by a secondary process. These processes, generally speaking are obtained by passing paper or board over one or a series of rolls sometimes of different material, with or without heat, under pressure.

There is no suggestion contained in our original decision, or in the decision of the majority herein, that the subject merchandise was, at any time, passed over one or a series of rolls, sometimes of different material, with or without heat, under pressure, as outlined in the above Senate Finance Committee report. The said report makes it clear that the Congress intended the term "plate finished" to indicate a gloss produced by a secondary process. It would appear, therefore, that unless the instant merchandise had a secondary process applied to it, it should not be held to be "plate finished." On the other hand, if the merchandise had a secondary process applied to it, how can it be held that "The finished hardboard is made in that one single operation?"

The fact, if it be a fact, as held by the majority, that hardboard can be produced without the use of a caul plate does not *ipso facto* make the involved hardboard "plate finished." The Congress has made it plain what it intended to encompass by the words "plate finished." That intent we must respect, whether or not hardboard can be made without a caul plate. It is my view that the words "plate finished" connote a process applied to hardboard after it has reached a stage where it is known and recognized as hardboard, rather than a process which is applied to pulp containing from 65 to 70 per centum water. This record does not make it clear how any process applied to pulp containing from 65 to 70 per centum water can give it a gloss. In any event, "plate finished" pulp would not be "plate finished" hardboard.

Considering the plain declaration by the Congress that "The terms 'plate finished, supercalendered or friction calendered' are here used to indicate a gloss produced by a secondary process," I am unable to agree with the holding of the majority "* * * that no specific process designed to create the gloss is dictated."

I am in agreement with the majority that it is important to know

what hardboard is, and, in my opinion, it is equally as important to know what the secondary process is and exactly when and where it starts or comes into existence, as referred to by the majority.

The following is quoted from the majority opinion:

* * * It is our view that it was the intention of Congress * * * in phrasing paragraphs 1402 and 1413 to impose a higher rate of duty upon pulpboard having a gloss produced by a secondary process, that is, secondary from the point of view of necessity rather than from the point of view of a subsequent process applied to a preexisting material, * * *.

The above quotation sets up two rules for determining whether or not a process applied to the subject merchandise was a secondary process. One of these rules is based on the point of view of necessity, and the other is based on the point of view of a subsequent process applied to a preexisting material. The majority discards the latter in favor of the former in deciding that the subject merchandise is "plate finished." The rule for determining the classification of merchandise based on the point of view of a subsequent process applied to a preexisting material is of long standing, having been announced and applied as long ago as March 9, 1916, in the case of *United States* v. *Macy*, 7 Ct. Cust. Appls. 8, T. D. 36256, and has been followed in many decisions since that date. As to the rule announced by the majority of finding the proper classification of the instant merchandise based on the point of view of necessity, my research has not revealed any decision of any court announcing such a rule. The majority opinion cites no authority in support of such a rule.

A consideration of said paragraphs 1402 and 1413 reveals that Congress therein specifically provided for paper board, wallboard, pulpboard, and other boards and varied the rates of duty according to whether or not such boards had been "plate finished." Said paragraphs make no provision for pulp containing from 65 to 70 per centum water, "plate finished." In my opinion, said paragraphs require the application of the rule of a subsequent process applied to a preexisting material in determining whether or not the boards therein provided for are "plate finished."

When the rule for finding the proper classification of merchandise based upon a subsequent process applied to a preexisting material is applied to the merchandise in this case, I see no escape from the conclusion that the instant board has not been "plate finished."

The views herein expressed are not in complete agreement with the views entertained by me when I concurred in the former decision on this same subject. However, upon a consideration of the record now before me, my present views are as herein expressed.

Since I have reached the conclusion that the instant merchandise is not "plate finished," it becomes necessary to consider the question

of whether the subject merchandise belongs to that class or kind of wallboard which was, at and prior to the passage of the Tariff Act of 1930, or at and prior to the effective date of the trade agreement under which it was classified, chiefly used as wallboard. On this point, the testimony is conflicting, the witnesses for the plaintiff testifying that it was chiefly used as wallboard within certain territorial limits, and the witnesses for the defendant testifying that it was not chiefly used as wallboard within certain territorial limits. It is not necessary, however, that I should give further consideration to the testimony than to observe that the testimony of the witnesses for the plaintiff covered only the following states, or portions thereof:

Arkansas, Ohio, West Virginia, Michigan, Illinois, New York, Pennsylvania, Kansas, Missouri, Oklahoma, Nebraska, Colorado, Indiana, Texas, New Mexico, Mississippi, Louisiana, and Tennessee.

I realize, of course, that it was not incumbent upon the plaintiff herein to show that in every part of the United States the chief use of the involved merchandise was as wallboard. The determination of chief use not only involves a territorial or geographical consideration, but, as well, the quantity of the merchandise used. However, chief use must be established generally throughout the United States, and such use cannot be local or partial.

In the case of *United States* v. *S. S. Perry*, 25 C. C. P. A. (Customs) 282, T. D. 49395, it was held that the testimony of one witness that the merchandise there involved was chiefly used as chicken leg bands in the States of California, Oregon, and Washington was sufficient to establish chief use of such merchandise. The witness also testified that the States of California, Oregon, and Washington were the principal poultry center of the United States. In the present case, we have no testimony indicating that any particular section of the United States is the principal center in which hardboard and wallboard were chiefly used.

For the foregoing reasons, I am of the opinion that while the plaintiff has established the fact that the subject merchandise is not "plate finished," it has failed to establish that said merchandise belongs to that class or kind of hardboard which was chiefly used as wallboard on or about June 17, 1930, or at or about the effective date of the trade agreement under which it was classified.

Since the plaintiff has failed to establish by proper evidence the chief use of the subject merchandise, I join my associates in overruling all claims in this suit, while at the same time disagreeing with the majority holding that the subject merchandise is plate finished.