No. 63200.—John V. Carr & Son, Inc., *v.* United States, protest 288816–K (Detroit).

RAO, Judge: In this case, there is presented for determination the question of the proper classification for customs purposes of certain imported merchandise, invoiced as "Wood Pulp Insulating Board Strips." All of said strips were 1⅛ inches in width, ½ or ⅝ inch in thickness, and either 48 or 72 inches in length. This merchandise was assessed with duty at the rate of 15 per centum ad valorem, pursuant to the provision in paragraph 1413 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, for:

> Papers and paper board and pulpboard, including cardboard and leatherboard or compress leather, embossed, cut, die-cut, or stamped into designs or shapes, such as initials, monograms, lace, borders, bands, strips, or other forms, or cut or shaped for boxes or other articles, plain or printed, but not lithographed, and not specially provided for.

It is here claimed that said merchandise is more appropriately provided for in paragraph 1402 of said act, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, and/or as supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, as follows:

> Paper board, wallboard, and pulpboard, including cardboard (but not including leather board or compress leather, and except strawboard, solid fiber shoe board and all counter board, and pulpboard in rolls for use in the manufacture of wallboard), not plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined, or vat-lined, embossed, printed, decorated or ornamented in any manner, not cut into shapes for boxes or other articles and not specially provided for:

| | |
|---|---|
| Wallboard and wet-machine board other than beer mat board_____ | 5% ad val. |
| Other_____ | 7½% ad val. |

At a pretrial conference, counsel for the respective parties agreed that the merchandise in issue, samples of which were received in evidence as plaintiff's exhibits 1–A and 1–B, had not been subjected to any of the processes enumerated in paragraph 1402, as modified, *supra*; that the collector invoked that portion of paragraph 1413, as modified, *supra*, which relates to pulpboard, cut or stamped into designs or shapes, such as strips or other forms, not specially provided for; and that the merchandise is made from wood pulp.

The evidence reveals that the merchandise at bar is made from wood pulp rendered waterproof by the addition of rosin sizes and alum. The mixture is pressed into sheets 12′4″ by 4′4″, by ½ to ¾″ in thickness, and dried. It is then cut to sizes as specified. In the case of the instant board, the specifications called for 1⅛″ widths and 48 or 72″ lengths. After importation, this material is used as core stock in the manufacture of doors. It is first cut to the requisite length to be placed horizontally between the plywood faces which form the doors. These additionally cut lengths vary, in 2-inch progressions, from 6 to 32 inches. In some instances, although not as a regular practice, the strips are

also sized as to width. The core serves to insulate the door against moisture, temperature changes, and sound, and also prevents warping. Some 13 to 18 strips are used for each door.

Other testimony adduced on behalf of plaintiff tends to indicate that in composition, if not in size, pulpboard of the character of that at bar is known as insulating board, the prime purpose of which is to resist heat and/or cold. It is used for ceiling tile, roof insulation, wall sheathing, insulation at the edge of a roof, and as insulation backer for aluminum siding.

One of the witnesses for the plaintiff, with some years of experience in the sale of building materials to wholesalers and dealers, expressed the opinion that wallboard, which is a material used as a wall to form the interior surfaces of a room, and may be composed of insulating board, would not ordinarily be found in the narrow widths of the merchandise at bar. Indeed, nowhere in the record was it affirmatively established that insulating board in the width of the strips at bar was capable of use in the formation of walls, or had ever been so used.

Webster's New Collegiate Dictionary, 1949, defines wallboard as:

Board or other material for use as or against a wall; specif., an artificial board of wood fiber, cane fiber, or the like, made in large sheets and used for the interior sheathing of walls of rooms.

In an opinion, in which Ford, J., concurred in the conclusion reached by this court, upon grounds other than those found by the majority, the view was expressed that the provision in paragraph 1402, *supra*, for wallboard was a designation by use, requiring proof, with respect to merchandise claimed to be wallboard, that it "belongs to that class or kind of wallboard which was, at and prior to the passage of the Tariff Act of 1930, or at and prior to the effective date of the trade agreement under which it was classified, chiefly used as wallboard." In this connection, he further stated that "chief use must be established generally throughout the United States, and such use cannot be local or partial." See the opinion of Ford, J., concurring in part, dissenting in part, in the case of *F. S. Whelan & Sons* v. *United States*, 40 Cust. Ct. 192, C.D. 1982.

The record in the instant case is so completely lacking in the foregoing elements of proof, which we deem to be essential, as to compel the conclusion that plaintiff has failed to substantiate the claim that the merchandise at bar is wallboard.

On the question of whether or not the collector properly classified the subject pulpboard stripping as pulpboard, cut into shapes, such as strips, it appears to be the position of plaintiff, predicated in large measure upon the case of *Freund Mayer & Co.* v. *United States*, 39 C.C.P.A. (Customs) 123, C.A.D. 474, that since, in its condition as imported, the merchandise required further processing, to wit, cutting to desired lengths, it was not a finished article, but a material from which a finished article had yet to be made, and, therefore, not within the scope of the provision for papers, cut to shapes, in the form of strips. The following is quoted from the cited case:

We think it may be questioned fairly whether in this case there exists any necessity for a construction of the involved phraseology of the paragraph by resorting to the rule of *ejusdem generis*. That portion of paragraph 1413 here invoked by appellant specifies six classes of *finished* articles, viz, "initials," "monograms," "lace," "borders," "bands," and "strips," but it also adds *"or other forms,"* and in the same clause provision is made for "[articles] cut or shaped for boxes *or other articles."* (Italics ours.) This latter phraseology would seem to cover material shaped to make finished articles for which *material* the duty rate is fixed at 30 per centum ad valorem. Where the finished articles are boxes they are provided for *eo nomine* at 35 per centum ad valorem, and in the case of fin-

ished articles other than boxes they probably would answer the description of manufactures of paper and require duty assessment at 35 per centum ad valorem. [Italics quoted.]

As we construe the *Freund Mayer* case, *supra*, it was not intended as an affirmative holding that only finished articles are contemplated by the portion of paragraph 1413 here under consideration. On the contrary, it seems clear that the court intended the interpretation to be that the fact that a paper article may have been finished or completely manufactured did not preclude its being encompassed by the provision. This is the logical interpretation necessarily flowing from the circumstance that the merchandise there at issue consisted of paper napkins ready for immediate use, and appears to be an answer to the contention of the Government who, as appellee, had urged that the paper-cut-to-shape portion of paragraph 1413 was limited to articles which had not reached the stage of being manufactures of paper.

The instant record does not negative the fact that the merchandise at bar was cut into strips prior to importation, although the witnesses attempted to distinguish between shapes in the form of strips, and dimensional stock cut to specifications calling for narrow widths. Nor, in the absence of a commercial designation which is not at issue here, could a contrary position have been successfully maintained, since, in their predominance of length over width, the subject pulpboard articles fit squarely within the dictionary definitions of the term, which are unanimous in showing strips to be comparatively long, narrow pieces.

The essential characteristics of an article which entitle it to be called a strip are relative length against narrow width. Whether the article has further to be treated to prepare it for a designated use, or is otherwise unfinished as regards its adaptability for any other purposes, it is, nonetheless, a strip whenever these two elements coexist. In other words, its identity as a "strip" is established by, and derives solely from, its dimensional aspects, and an article does not become something other than a strip simply because, when applied to its destined use or uses, it is shortened in length, or further narrowed in width.

In this respect, "strips" bear a resemblance to "borders" which are also mentioned in this portion of paragraph 1413, as an example of a form into which paper, paperboard, or pulpboard may be cut. Ordinarily, in determining whether or not an article is a border, the fact that it has not been cut to a specific length for a prescribed application would not be a relevant consideration. Its finished state as a "border" would seem to depend upon factors not related to any designated length, or *per se* adaptability to a given use.

A strip is a strip, and if it has been brought to that condition by cutting, and is composed of pulpboard, it would seem to meet the terms of the provision invoked by the collector. And since no other limitation is imposed by the statutory language, we are not warranted in further circumscribing it. It must, of course, appear that the cutting into the form of strips is an intentional act performed for that purpose. Where the strips are merely byproducts resulting from the shearing of sheets of pulpboard to standard dimensions, they would not be embraced by the phraseology of this provision. *International Power & Paper Co. et al.* v. *United States*, 62 Treas. Dec. 330, T.D. 45935. But that is not the case here. The instant articles have been deliberately brought to the shape of strips by one of the processes outlined in this portion of paragraph 1413, as modified, *supra*, and they are, therefore, literally provided for therein. All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.