(C.D. 4479)

WEYERHAEUSER COMPANY *v.* UNITED STATES (ABITIBI CORPORATION, PARTY-IN-INTEREST)

Court No. 69/39396

(Decided November 5, 1973)

*Price, Cushman, Keck, Mahin & Oate* (*James A. Broderick* and *Edward S. Silber* of counsel) for the plaintiff.

*Irving Jaffe*, Acting Assistant Attorney General (*Frederick L. Ikenson*, trial attorney), for the defendant.

MALETZ, Judge: This is an action by an American manufacturer challenging the classification by the government of certain imported fiberboard,[1] having a density of approximately 42 pounds per cubic foot,[2] under item 245.90 of the tariff schedules as "Building boards not specially provided for, whether or not face finished: * * * Other boards, of vegetable fibers (including wood fibers)." In accordance with that item, duty was assessed at 2 per centum ad valorem.

Plaintiff contends that the merchandise is "hardboard" and claims alternatively that it is properly classifiable under one of the following four provisions:

| | Hardboard, whether or not face finished: Not face finished; and oil treated, whether or not regarded as tempered, but not otherwise face finished: | |
|---|---|---|
| 245.00 | Valued not over $48.33⅓ per short ton | 12% ad val. |
| 245.10 | Valued over $48.33⅓ but not over $96.66⅔ per short ton | 12% ad val., but not more than $7.25 per short ton. |
| 245.20 | Valued over $96.66⅔ per short ton | 7.5% ad val. |
| 245.30 | Other | 21.5% ad val. |

The parties agree that the imported merchandise consists of hard fiberboards, 7/16-inch thick, made up of wood fibers bonded under heat and pressure, having a smooth finish on one surface and a screen

---

[1] The fiberboard in question was imported in May 1969 from Canada by the Abitibi Corporation, the party-in-interest. Abitibi, it is to be noted, took no part in the case.

[2] Density is the weight of a substance in relation to its volume and is usually expressed as pounds per cubic foot.

finish on the other, with a density of approximately 42 pounds per cubic foot. The imported boards were manufactured under a process known in the hardboard industry as the "wet process." In this process, wood chips are reduced to fibers and fiber bundles, to which resins, binders, and waterproofing agents are added. The resulting substances are then heated and formed into a board under a hot press.

Against this background, plaintiff contends that the common meaning of the term "hardboard" at the date of enactment of the tariff schedules in 1962 encompassed fiberboard, such as the imported merchandise, with a density less than 50 pounds per cubic foot. In contrast, the government argues that at the time of the enactment of the tariff schedules in 1962, the common meaning of the term "hardboard" did not embrace fiberboard, such as that involved here, which had a density of less than 50 pounds per cubic foot.[3] Thus, the question presented is whether the common meaning of the term "hardboard" at the time of enactment of the tariff schedules encompassed fiberboard with a density less than 50 pounds per cubic foot, i.e., 42 pounds per cubic foot.

## I

At the outset, it is clear that the term "hardboard" is an *eo nomine* designation which, without limitation or a demonstrated legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of the article. *United States* v. *Victoria Gin Co.*, 48 CCPA 33, C.A.D. 759 (1960) ; *Nootka Packing Co.* v. *United States*, 22 CCPA 464, T.D. 47464 (1935) ; *John L. Westland & Son, Inc.* v. *United States*, 42 Cust. Ct. 229, C.D. 2091 (1959). It is equally clear that Congress is regarded as having used the name of an article in its commercial sense which, in the absence of evidence to the contrary, is presumed to be the common meaning the word has in ordinary use. *United States* v. *Victoria Gin Co., supra*, 48 CCPA at 35. No commercial designation having been established here, it is thus necessary to ascertain the common meaning of the imported merchandise. On this aspect, as pointed out in *United States* v. *John B. Stetson Co.*, 21 CCPA 3, 9, T.D. 46319 (1933) :

> * * * The common meaning to be attached to a term or word used by the Congress in a provision of a tariff act is a matter to

---

[3] In paragraph 23 of its answer to the complaint, defendant interposed an affirmative defense that "[a]t the time of the effective date of the tariff schedules, there existed a commercial designation of 'hardboard' which did not include board having the physical characteristics of the merchandise in issue." However, defendant offered no evidence at trial nor presented any argument in its brief in support of this affirmative defense. In these circumstances, the affirmative defense on the basis of commercial designation is dismissed.

be determined by the court having the same under consideration. In making this determination the court may rely upon its own understanding of the word or term used, and it may assist its own understanding by reference to the works of standard lexicographers, scientific authorities, the testimony of witnesses, or by such other means as may be available. If testimony be offered upon the common meaning of a statutory word or term such testimony is advisory only and has no binding effect on the court. * * *

Finally, it is axiomatic that the common meaning of an *eo nomine* tariff provision is to be determined and is fixed at the date of its enactment, and does not fluctuate as the meaning of words might subsequently vary. E.g., *Hoyt, Shepston & Sciaroni* v. *United States*, 52 CCPA 101, 103–104, C.A.D. 865 (1965); *Davies Turner & Co.* v. *United States*, 45 CCPA 39, 41–42, C.A.D. 669 (1957); *United States* v. *Victoria Gin Co., supra*, 48 CCPA at 37. Applying that principle here, it is important to observe that the date of enactment of the various hardboard provisions in the tariff schedules was May 24, 1962—the date of enactment of the Tariff Classification Act of 1962. 76 Stat. 72. See *Arthur J. Fritz & Co.* v. *United States*, 59 CCPA 46, C.A.D. 1036 (1971); *United States* v. *National Silver Co.*, 59 CCPA 64, C.A.D. 1040 (1972).

For the reasons that follow, it is concluded that in or about 1962, and prior thereto, fiberboard, such as the imported merchandise, having a density of less than 50 pounds per cubic foot, was within the common meaning of "hardboard."

## II

We turn first to the record which consists of the testimony of 5 witnesses (all of whom were called by the plaintiff), one joint exhibit (a stipulation), 21 exhibits that were introduced by plaintiff and 24 exhibits that were introduced by defendant. In the circumstances of the present case, it is believed that the record is best understood by summarizing the testimony that was presented.

Plaintiff's first witness was Wayne C. Lewis, a research engineer for the Forest Products Laboratory of the U.S. Department of Agriculture's Forest Service. He obtained his degree in engineering in 1936 from the University of Wisconsin and became a registered professional engineer in the State of Wisconsin in 1940. He belongs to numerous engineering societies, among which are the Forest Products Research Society and the American Society for Testing and Materials where he served as chairman of the committee on wood and chairman of the subcommittee on wood-based fiber and particle panel materials.

In 1966, Lewis received the Award of Merit and title of fellow in the American Society for Testing and Materials (hereinafter referred

to as "ASTM") and in 1968 he won the Gottshalk Award for outstanding service to that society. Through 1971, he had published 47 papers and articles on the subject of wood, of which more than 15 dealt with hardboard.

Lewis' employer, the Forest Products Laboratory, is a national research laboratory and deals with forest products utilization. It maintains close cooperation with, and frequently acts as consultant for, the National Bureau of Standards. During the past seven years, the Forest Products Laboratory completed a basic study on high density hardboard, which study was conceived by Lewis and the work done under his direction.

Lewis testified that the imported fiberboard—which had a density of 42 pounds per cubic foot—was considered by the trade in 1962 and 1963 to be hardboard. The trade, he said, consisted of builders, carpenters, building officials, architects, jobbers and retailers.

Another factor of relevance of this aspect is that prior to 1963, the Bureau of Census, Department of Commerce, classified hardboard in Standard Industrial Classification Code 26613, and that the definition for this code number was "hard pressed fiberboard (*over 26 pounds per cubic foot*)." [Emphasis added.] It is further relevant in this respect that Lewis testified that in 1962 and 1963, the trade considered as hardboard, board that had a minimum density of 26 pounds per cubic foot. In short, the testimony of Lewis on this score indicates that the industry definition of the term hardboard, i.e., board having a minimum density of 26 pounds per cubic foot, was the same as the Census Bureau's definition of the term.[4]

On cross-examination, Lewis testified that the hardboard industry had undergone an evolution since the product was invented in 1928. In this connection, he stated that the first hardboard products manufactured on a large scale were very dense and that even at the end of World War II, there was no manufacturer of significance making board in the 31 to 50 pound per cubic foot density range. It was in this context that in the 1950's Lewis coined the term *medium-density building fiberboard* to describe hardboards in the 31 to 50 pound per cubic foot density range because he believed such products would soon be developed and produced. His expectations in this regard soon came to pass, and by the late 1950's and early 1960's, several commercial products in the 31 to 50 pound per cubic foot density range began to appear in the commerce of the United States.

Further, on cross-examination, Lewis testified that while there was a distinction in the 1962–63 period between hardboard and medium-

---

[4] Additionally, Lewis testified that at the present time the minimum density requirement for board to be considered hardboard is 31 pounds per cubic foot.

density building fiberboard, it was not a clear-cut one. For according to the witness, in that period the industry was an evolving one from the standpoint of developing products to satisfy the need for house siding materials, and so far as the trade was concerned, both medium-density building fiberboard and fiberboard having a density of over 50 pounds per cubic foot were regarded as hardboard.

It is to be added that Lewis was technical adviser for a publication entitled "Commercial Standard CS251–63" that was issued by the Commodity Standards Division of the U.S. Department of Commerce, effective February 11, 1963. Section 2.2 of that standard defined hardboard as "a board material manufactured of wood fibers, refined or partly refined and formed into a panel having a *density range* of *approximately 50 to 80 pounds per cubic foot* under carefully controlled optimum combinations of consolidating pressure, heat, and moisture so that the board produced has a characteristic natural ligneous bond." [Emphasis added.] Lewis testified that this definition of hardboard was *technically* recognized and was one that he himself as a *scientist* followed. However, he emphasized with respect to the 50 pound per cubic foot minimum density requirement specified in the definition, (1) that in the period 1962–63 and prior thereto, *the industry* understood the term hardboard to be board having a density of 26 pounds per cubic foot and over; (2) that, therefore, the "Commercial Standard" definition did not reflect the industry's understanding of the term hardboard in the foregoing period; (3) that during this period, the industry neither recognized nor followed the "Commercial Standard" definition; and (4) that in light of these considerations, as soon as the "Commercial Standard" definition was published, the industry requested a change in the minimum density requirement.[5]

Lewis' attention was then directed to the ASTM standards for building fiberboards which appeared in the "*Tentative Definitions of Terms Relating to Wood-Base Fiber and Particle Panel Materials.*" These "tentative definitions," which were issued in 1958 and revised in 1960 and 1963, all provided as follows:

### CLASSIFICATION OF FIBROUS-FELTED BOARDS

Structural Insulating Board.—A fibrous-felted, homogeneous, or laminated panel having a density range of approximately 10 to 26 lb per cu ft, manufactured of refined or partly refined ligno-cellulosic fibers with a primary integral bond, and to which other materials may have been added during manufacture to improve certain properties.

---

[5] In 1966 the Commercial Standard definition was revised to include as hardboard, board that had a density as low as 31 pounds per cubic foot.

<u>Medium-Density Building Fiberboard.</u>—A felted, homogeneous, or laminated panel having a density range of approximately 26 to 50 lb per cu ft, manufactured of refined or partly refined ligno-cellulosic fibers with a primary integral bond, and to which other materials may have been added during manufacture to improve certain properties.

<u>Hardboard.</u>—A fibrous-felted, homogeneous, or laminated panel having a density range of approximately 50 to 80 lb per cu ft, manufactured under carefully controlled optimum combinations of consolidating pressure, heat, and moisture so that a softening of lignin occurs and the board produced has a characteristic natural ligneous bond, and to which other materials may have been added during manufacture to improve certain properties.[6]

The witness Lewis testified that these definitions were not the definitions known in the industry in 1958, and that in 1962–63 the common meaning of the word hardboard was not the same as the ASTM meaning.

Plaintiff's second witness was Frank E. O'Dowd, executive marketing director of building products for the Edward Hines Lumber Co. (hereinafter referred to as "Hines"). Hines is a Chicago based lumber company with lumber manufacturing facilities in four western states. It also has sawmills in Louisiana, Mississippi and Arkansas, six wholesale distribution warehouses in the middle west and 25 retail lumber yards in the Chicago area.

O'Dowd has been with the Hines company for 30 years, and in 1963 was the general manager of its wholesale warehouse division. In that capacity, he was involved in management, funding, maintaining contact with suppliers and customers, directing sales, and general operation of the warehouses. He testified that from 1955 to 1965, Hines manufactured a number of hardboard products under the trade name of Allwood. It also handled hardboard products of other manufacturers such as the Insulite Division of Minnesota and Ontario Paper Co. and the Armstrong Cork Company.

O'Dowd produced sales analysis sheets for Hines' Skokie Warehouse for December 1962 and December 1963. Classification #5 on these sheets reads "HARDBOARD NOT ALLWOOD," which covered "hardboard" products other than Allwood that Hines distributed. Included in this category were (i) Insulite's Primed Siding which, in the period in question, had a density of 34 to 38 pounds per cubic foot; and (ii) a fiberboard siding product of the Armstrong Cork Company which, beginning in early 1962, had a density of 37 pounds per cubic foot.

Based upon his 30 years of experience in marketing and selling in the

[6] In 1967, the ASTM likewise made a revision in its definition of hardboard similar to that made in the Commercial Standard.

building materials industry, O'Dowd was of the opinion that in 1962–63 the industry considered hardboard as:

> * * * a building product that is made by grinding up solid wood, first, into chips, and thence back into wood fibers, and joining those fibers with liquids and adhesives, and binding them into a mat that, in the case of hardboard, is pressed into a finished product of various thicknesses * * *.

O'Dowd further testified that the imported merchandise in issue here would have been considered hardboard in 1962–63 and would be considered hardboard today.

Plaintiff's next witness was Kenneth R. Peterson, the technical director of the American Hardboard Association—a trade association located in Chicago, Illinois—made up of hardwood manufacturers in the United States for the purpose of exchanging technical, scientific, production and educational information. He has been the technical director of the association since 1966 and, through the technical committee, he conducts research and determines test methods of standards, specifications, and educational material.

The witness obtained a B.S. degree in forest management from the University of Massachusetts in 1953 and an M.S. degree in wood science and technology from Yale in 1955. He then worked on the research staff at Yale while a graduate student until 1955, when he became professor of wood science and technology at the University of Illinois, after which he joined the Hardboard Association in 1966. He stated that beginning in 1960, and periodically thereafter while he was a college professor, he took his class through three hardboard plants to show the students the various hardboard operations.

The witness Peterson further testified that he supervised the tests of samples of the imported merchandise at the Masonite Research Laboratories in St. Charles, Illinois and that on the basis of these tests found that the density was approximately 42 pounds per cubic foot. He stated that he would definitely have identified the imported merchandise as hardboard in 1962 and 1963 and that it would have been considered hardboard by the industry in 1962–63. In this connection, it is to be noted that the American Hardboard Association's Articles of Association for the years 1953, 1955, 1959, 1960, 1961, 1962 and 1963 define "Hardboard" as a "board comprised of inter-felted ligno-cellulosic wood fibers consolidated under heat and pressure and having a specific gravity greater than 0.5 [31.15 pounds per cubic foot]." [7]

Plaintiff's next witness was Ray C. Marck, the manager of the Testing and Analysis Section of the Research Center of the Masonite Cor-

---

[7] A specific gravity of 1.0 equals a density of approximately 62.3 pounds per cubic foot. Perry, *Chemical Engineers' Handbook* 38 (3d ed., 1950).

poration, where he is in charge of testing functions for the research center. His additional duties include securing competitive data on other products, preparing special display samples and preparing statistical data on Masonite's and competitors' products. The witness has been employed by Masonite since 1959 and from 1962 to 1964 was manager of a Masonite siding plant.

Since about 1930, he testified, Masonite has manufactured a product known as Quarterboard which is still manufactured at the present time in substantially the same manner as in 1930. Quarterboard, he stated, had a density in 1962–63 ranging from 36 to 40 pounds per cubic foot, and was considered by Masonite to be hardboard. He added that Insulite siding—which, as previously noted, had a density of 34 to 38 pounds per cubic foot—was a hardboard product that was competitive with Quarterboard.

Plaintiff's last witness was Dr. Poo Chow, a professor of wood science in the Forestry Department of the University of Illinois. The witness received a B.A. degree in forestry from the Taiwan Provincial College of Agriculture in 1957, an M.A. degree in forest products from Louisiana State University in 1961, and a Ph. D. in wood science technology, forest products, from Michigan State University in 1969. At the University of Illinois, he has taught courses in moisture relationship and mechanical properties of lumber; plywood, particle board, and fiberboard; and physical properties of wood-based materials.

Prior to receiving his doctorate, Chow was employed by Pope & Talbot Corp., Oak Ridge, Oregon, from 1962 to 1966. In 1962 he was a laboratory assistant for th ʿ company; in 1963–64 he was the company's laboratory director and technical director; and in 1966 he was the quality control supervisor for the company's particle board and hardboard plants. As part of his duties, he also tested all the commercial hardboards that were available during 1962–63 because Pope & Talbot intended to build a new hardboard plant and, as a preliminary step, to develop a new product which would be at least equivalent to or better than any hardboard product then on the market.

To carry out this project, Chow developed two new hardboard products in 1962—Customfiber, which was a thicker type of hardboard, with a density ranging from 44 to 55 pounds per cubic foot, and Customite, which was a thinner hardboard. The variance in density, he testified, was dependent upon the end use of the product. Thus, when a more stable board was needed with better insulation properties and less linear expansion, the density would be below 48 pounds per cubic foot. On the other hand, when greater strength and machinability around the board edge was required, higher densities were utilized up to 55 pounds per cubic foot.

Chow further stated that there was no significance to a density of 50 pounds per cubic foot and that the word "hardboard" described both Customfiber and Customite. In developing these two new hardboard products, Chow compared them with competing hardboard products such as those produced by Masonite, Insulite, and Armstrong, all of which, he said, were, in 1962, referred to in meetings and discussions with sales and marketing personnel at Pope & Talbot as hardboard. The witness defined "hardboard" as "a generic term for sheet panel products, made from ligno-cellulosic wood fiber, of vegetable fiber material, and consolidated under * * * high temperature and pressure in the hot press."

Based upon his examination of representative samples of the imported merchandise, the witness stated they would have been considered by the industry as hardboard in 1962–63.

Chow further testified that he agreed with the following statement in the *Forestry Handbook* (1961 ed.) p. 14.64:

> Hardboard is variously defined. It was originally a screen-backed, wet-felted board with a specific gravity of 0.9 [57 pounds per cubic foot] to 1.1 [68 pounds per cubic foot]. A more comprehensive definition is a fiberboard composed of vegetable fiber and natural and added binders, formed in a mat, and pressed and heated so that the resulting product is an essentially homogeneous sheet. The minimum specific gravity is subject to debate. * * *

On cross-examination, Chow stated that while attending Louisiana State University in 1961, his professor used the foregoing definition and likewise indicated that the specific gravity of hardboard was the subject of debate. However, he emphasized that there was no controversy so far as the industry was concerned; that in the 1962–63 period fiberboard having a density of less than 50 pounds per cubic foot was considered by the industry to be hardboard; and that in that period, the term "medium-density fiberboard" was superfluous since it was encompassed within the meaning of the term "hardboard."

### III

From the foregoing, it is apparent that testimony concerning trade usage was unanimous that the imported board would have been called hardboard in 1962–63. Every witness who testified stated unequivocally that at the date of the enactment of the tariff schedules in 1962, the imported merchandise would have been considered by the industry to be hardboard. The defendant offered no testimony to the contrary as to trade usage.

Moreover, fiberboard products with densities even lower than that of the imported merchandise were called hardboard in 1962–63. Thus, the witness O'Dowd testified that Insulite Primed Siding, with a

density of only 34–38 pounds per cubic foot was called hardboard by the trade. In addition, Insulite Primed Siding, Armstrong Siding, with a density of only 37 pounds per cubic foot, and Tuff-Wood Primed Siding, with a density of only 34–38 pounds per cubic foot, were all advertised as hardboard in the 1962–63 period.

It is to be noted that the word *hardboard* was coined by William H. Mason, the inventor of the product, and contained no minimum density requirement. Thus, the basic patent for hardboard (Patent No. 1,663,505) which was issued in 1928, contained the following language:

> The production from natural wood * * * of coherent, grainless, hard, dense, stiff, and strong products having practically all the characteristics of natural wood, but of increased density, and remade so as to be without grain and free from the weakness which natural wood has "across the grain".

Similarly, dictionaries in defining hardboard make no mention of minimum densities. For example, *Webster's Third New International Dictionary* (1961 ed.) defines hardboard as:

> A composition board made by shredding wood chips by sudden release of high steam pressure and then compressing them with or without added binders or other materials at high temperatures.

Also, as previously mentioned, the Articles of Association of the American Hardboard Association for the period in question defined "Hardboard" as a "board * * * having a specific gravity greater than 0.5 [31.15 pounds per cubic foot]."

Additionally, it is significant that the term *hardboard*, as defined by the Supreme Court in a decision prior to the enactment of the tariff schedules, encompassed merchandise, such as that involved here, which had a density of less than 50 pounds per cubic foot. Thus, in *United States* v. *Masonite Corp.*, 316 U.S. 265, 267–8 (1942), the Court defined the term as follows:

> * * * Hardboard—a homogeneous, hard, dense, grainless, synthetic board—is made from wood chips. It has a high tensile strength, low water absorption and a *density that ranges from 30 to 60 lbs. per cubic foot.* It is used in the building industry as wallboard, paneling, flooring, ceilings and forms into which concrete is poured. * * * [Emphasis added.] [8]

## IV

Defendant, however, insists that there was an intention on the part of Congress in 1962 to limit the term hardboard as used in the tariff

---

[8] See also *F. S. Whelan & Sons* v. *United States,* 34 Cust. Ct. 208, 211, C.D. 1706, 136 F. Supp. 328 (1955) ; *F. S. Whelan & Sons* v. *United States,* 40 Cust. Ct. 192, 195, C.D. 1982 (1958).

schedules to fiberboard with a minimum density of 50 pounds per cubic foot. As support for this conclusion, defendant points out that in a memorandum, dated July 1, 1954, to the Senate Committee on Finance and the House Committee on Ways and Means, "on S. 3670 and H.R. 9666, identical bills 'to amend section 1001, paragraph 412, of the Tariff Act of 1930, with respect to hardboard'," the Tariff Commission stated (defendant's exhibit A, pp. 1–2) :

> * * * This term [hardboard], the Commission understands, was originally coined by the Masonite Corporation but has now become generic and is used in commerce in the United States to describe a board, usually smooth-surfaced on one side and "screen-marked" on the other, manufactured from cellulosic fibers in thicknesses generally from one-eighth to five-sixteenths of an inch and *in densities ranging from approximately 50 to 75 pounds per cubic foot. There is also produced domestically and abroad a so-called semihard board of lesser density. Whether this latter product would be included in the term "hardboard" the Commission is unable to state definitely, but it seems doubtful that it would.* [Emphasis added.]

Defendant also notes that during the debate on H.R. 9666, 83d Cong., 2d Sess. (100 Cong. Rec. 12802 (1954)) and in the Committee Report which accompanied the bill (H. Rept. 2265, 83d Cong., 2d Sess. 2 (1954)), the following was stated:

> * * * This board [hardboard] is manufactured from cellulosic fibers in thicknesses generally from one-eighth to five-sixteenths of an inch and in densities ranging from approximately 50 to 75 pounds per cubic foot.[9]

Against this background, defendant contends that the eventual enactment in 1962 of the hardboard provisions amounted to legislative approval of the earlier Tariff Commission memorandum of 1954, which, defendant says, was itself ratified by the House and Senate in 1954 and 1955, respectively, as evidenced by H. Rept. 2265, *supra.*

Regarding the Tariff Commission's memorandum of 1954, it must be borne in mind that the principal issue before the Commission at that time was whether products known as hardboard should be dutiable under the general classification "Papers and Books" or whether such products should be classified as "Wood and Manufactures of." Accord-

---

[9] Although the House passed an amended version of H.R. 9666 in the second session of the 83d Congress and the Senate in the next session of Congress in 1955 (84th Cong., 1st Sess.) passed a similar provision as an amendment to a tariff bill, the Conference Committee deleted the hardboard reclassification portion of the bill in response to a letter from the President. This letter stated that "[b]y the Customs Simplification Act of 1954, the Congress instructed the U.S. Tariff Commission to review the entire schedule of tariff classifications and to recommend changes needed to remove anomalies and injustices. Action now by the Congress on any specific commodity would directly contravene this process which assures all industries of an orderly method for full consideration of their classification problems." See *Tariff Classification Study, Explanatory and Background Materials,* Schedule 2, at 205, 276 (1960).

ingly, the thrust of the Commission's memorandum was not directed toward distinguishing various kinds of fiberboards from one another, but rather toward determining whether such products were properly classified as wood or as paper. Moreover, the language of the proposed amendment to the Tariff Act of 1930, as contained in the Commission's 1954 memorandum, was different from that which was ultimately adopted by Congress in 1962. For when the tariff schedules were enacted some eight years after the Commission's memorandum, Congress chose to employ the undefined and unexplained term, *hardboard*. On the other hand, the language before the Commission in 1954 was as follows (defendant's exhibit A, p. 1) :

> hardboard when comprised of interfelted lignocellulosic fibers consolidated under heat and pressure into a *board characterized by a predominantly natural bond*. [Emphasis added.]

Thus, a board would not be described by the foregoing language before the Commission unless it was "characterized by a predominantly natural bond." It is not clear, even today, whether fiberboards in the 26 to 50 pound per cubic foot density range are characterized by such a bond. The Commission's statement in its 1954 memorandum—that it "is unable to state definitely" that a board with a density lower than 50 pounds per cubic foot "would be included in the term 'hardboard' * * * but it seems doubtful that it would" hence may have been based on the Commission's lack of knowledge as to whether such board was characterized by a predominantly natural bond. See e.g., *Masonite Corporation* v. *Celotex Co.*, 66 F. 2d 451, 452–3 (3d Cir. 1933).

Further, the Tariff Commission's 1954 memorandum was prepared prior to the introduction into the market of Insulite Primed Siding (density 34 to 38 pounds per cubic foot), Armstrong Siding (density approximately 37 pounds per cubic foot), and Tuff-Wood Primed Siding (density 34 to 38 pounds per cubic foot)—all of which (as previously discussed) were considered by the trade to be hardboard.

As defendant further observes, later in the same year, 1954, the Tariff Commission conducted hearings under the authority of section 332 of the Tariff Act of 1930, with respect to the hardboard industry in the United States, pursuant to a resolution and directive of the Senate Finance Committee. See United States Tariff Commission, *Hardboard, Report on Investigation Conducted Pursuant to a Resolution by the Committee on Finance of the United States Senate dated August 9, 1954*, at 2 (1955). In the course of these hearings the Commission received the statement of Donald Linville, then executive secretary of the Hardboard Association, wherein it was noted that "hardboard as shown in this proceeding ranges from 50 to 75 pounds per cubic foot and has a specific gravity of .8 or more." See defendant's exhibit B, p. 13. This statement, however, is at variance with the Arti-

cles of Association of the Hardboard Association which (as discussed before) defined hardboard as a board having a specific gravity greater than 0.5 [31.15 pounds per cubic foot]. It is also noted that at page 14 of his statement before the Commission, Linville referred to Masonite Quarterboard as hardboard. Yet the record here shows that in 1962 and previous years, the density of Masonite Quarterboard was well under 50 pounds per cubic foot.

Defendant also refers to Armin Elmendorf, an expert in the fiber-board field, who testified before the Tariff Commission in 1954 that hardboard must have a specific gravity of at least 0.85 [53 pounds per cubic foot]. However, the defendant never called Elmendorf to testify in the present case, thus leaving open such questions as to whether he would have had the same opinion in 1962 after the introduction into the market of Insulite Primed Siding, Armstrong Siding, and Tuff-Wood Primed Siding, all of which had densities from 34 to 38 pounds per cubic foot. Plaintiff, on the other hand, called as a witness Wayne Lewis, who had published articles advocating a restrictive definition of hardboard to cover board having a minimum density of 50 pounds per cubic foot. Even so, Lewis testified in the present case that the *industry* did not restrict its use of the term hardboard to products with densities greater than 50 pounds per cubic foot; to the contrary, he testified that the industry referred to boards with densities as low as 26 pounds per cubic foot as hardboard. In short, although Lewis was a primary advocate of the adoption of a more restrictive definition of hardboard, he nevertheless recognized that that definition was not adopted by the trade.

Additionally, defendant relies on the ASTM's "tentative" definition and the "Commercial Standard CS251-63" definition of hardboard as a board having a density range of approximately 50 to 80 pounds per cubic foot. It also relies on various articles in which distinctions were drawn between medium-density board siding, having a density between 31 and 50 pounds per cubic foot, and hardboard, having a density of over 50 pounds per cubic foot.

However, when such documentary evidence is considered in conjunction with the entire record, it would appear that in 1962 there existed simultaneously (1) a common trade meaning of the term hardboard, which encompassed board having a minimum density of well below 50 pounds per cubic foot; and (2) a restricted definition, i.e., a minimum density of 50 pounds per cubic foot, which some members of the scientific community were using. It must be kept in mind, in this connection, that the documents defendant introduced in evidence showing hardboard to include only that board with a density of over 50 pounds per cubic foot were admitted not for the truth of the matters contained therein, but to show trade terminology. However, de-

fendant's exhibits do no more than establish a restrictive usage of the term hardboard by various people in the *scientific* community; they do not negate the simultaneous existence of a broader common meaning in the *trade* of the term hardboard to encompass board in the medium-density range of 26 to 50 pounds per cubic foot.

Moreover, the scientific community was far from unanimous in accepting the cut-off point of 50 pounds per cubic foot as part of the definition of hardboard. For example, the *Forestry Handbook* (1961), *supra*, indicated that while originally hardboard was a screen-backed wet-felted board with a specific gravity of 0.9 to 1.1, it also indicated that "[t]he minimum specific gravity is subject to debate."

Even the ASTM's standards for building fiberboards, upon which the defendant relies heavily, bear witness to the confusion and lack of uniformity in the use of terms to describe fiberboards. The second paragraph of each ASTM standard introduced by the defendant provides:

> The terms used and defined herein differ slightly from some practice. Modifications appeared to be desirable to clarify the nomenclature since *confusion exists* because of the *similarity* of some *existing terms*. * * * [Emphasis added.]

What is more, an ASTM designation, even in conjunction with a commercial standard, does not establish a commercial designation more restrictive than the common meaning of a term. In *Cities Service Oil Co.* v. *United States*, 16 Cust. Ct. 110, C.D. 994 (1946), the merchandise was a substance invoiced as "tar," which had been imported to make asphalt, but was found to be unsuitable for that purpose. The only use which could be found for the importation was fuel oil. Plaintiff claimed that for the reason the importation was properly classifiable as fuel oil; the government argued to the contrary that its viscosity was too high under various standards for fuel oil. The court referred to the testimony of experts and to the dictionary definition of *fuel oil* and held that the importation was properly classifiable as fuel oil. It reasoned (16 Cust. Ct. at 112):

> During the course of the trial numerous references were made to certain specifications for standard grades of fuel oil established by the United States Bureau of Mines, the American Society for Testing Materials, and the Department of Commerce, and there is no doubt that the merchandise at bar does not come within the requirements for such standard grades of fuel oil for the reason that its viscosity rating is too high.
>
> * * * * * * *
>
> It is our view that the specifications cited during the course of the trial can only be considered as designating the outside limits of the standard grades of fuel oil, but not as limiting the scope of the term.

Similarly, in the present case, the minimum density rating in the standards cited by the defendant cannot be used to limit the scope of the term *hardboard*.

## V

In sum, the record shows that at the time of enactment of the tariff schedules, (1) fiberboard with a density well below 50 pounds per cubic foot was, according to the uncontradicted testimony of plaintiff's witnesses, considered and referred to by the industry as hardboard; (2) fiberboard products with a density even lower than that of the imported merchandise were advertised as fiberboard; (3) the Bureau of the Census had an administrative practice of classifying as hardboard, "hard pressed fiberboard (over 26 pounds per cubic foot)"; (4) judicial decisions defined as hardboard products that had a density well below 50 pounds per cubic foot; (5) the Articles of Association of the American Hardboard Association defined hardboard as a board having a specific gravity greater than 0.5 [31.15 pounds per cubic foot]; (6) neither the basic patent covering hardboard nor the dictionary definitions of hardboard made reference to or contained a minimum density requirement. Additionally, the record shows that at the time of enactment of the tariff schedules, there was some confusion and doubt, particularly in the scientific community, regarding the minimum density needed for a product to constitute hardboard.

In light of all these considerations, we must conclude that if, as defendant contends, Congress had intended to limit the hardboard provisions of the tariff schedules (items 245.00 to 245.30) to hardboard having a minimum density of 50 pounds per cubic foot, it would undoubtedly have so specified.[10] Relevant on this aspect is *John L. Westland & Sons., Inc.* v. *United States*, 42 Cust. Ct. 229, C.D. 2091 (1959). In that case, the importer contended the importations should be classified as "bolts." The collector had classified the merchandise as "articles or wares not specially provided for, composed wholly or in chief value of steel." The items in question were 5/16 of an inch long. The parties stipulated that similar items, when over ⅜ of an inch long, were included in the "bolts" classification. After consulting Webster's Dictionary and a trade dictionary, the court held that the importations were properly classifiable as bolts for the following reasons (42 Cust. Ct. at 231):

> From the foregoing definitions, it appears that the word "bolt" is defined without limitation as to length and we see no sound reason for holding articles like illustrative exhibit 2 to be any the

[10] The *Tariff Classification Study, Explanatory and Background Materials,* Schedule 2 (1960), contains no definition by the Tariff Commission of the term hardboard. Nor, in that Study, did the Commission, in discussing the proposed hardboard provisions, specify any minimum density requirement. See *id., pp.* 66–7.

less bolts than articles such as illustrative exhibit 1 which the parties hereto agreed come within the *eo nomine* tariff classification therefor.

*If it were the intent of Congress to limit the provisions of paragraph 330 of the tariff act to bolts of particular lengths it undoubtedly would have so specified. * * *[Emphasis added.]* [11]

In light of all the foregoing, it is held that the importations in issue—which had a density of 42 pounds per cubic foot—are properly classifiable as hardboard.

## VI

It is, of course, fundamental that having proven that the government's classification of the merchandise is erroneous, plaintiff had the further burden of showing which of its four alternative claims is correct. See e.g., *Western Stamping Corp.* v. *United States*, 57 CCPA 6, 8, C.A.D. 968 (1969). With respect to its claims under items 245.00, 245.10 and 245.20, it was necessary for plaintiff to prove that the imported merchandise was not face finished. This, plaintiff has not done. On the other hand, with respect to its claim under item 245.30, it was necessary for plaintiff to prove that the importations were face finished. Again, this plaintiff has not done. In short, plaintiff has presented no proof whatever as to whether the imported merchandise was or was not face finished. Accordingly, while the imported merchandise is properly classifiable as hardboard, the protest is overruled because of plaintiff's failure to prove any of its affirmative claims. Judgment will be entered to that effect.

(C.D. 4480)

SOL KAHANER & BRO. *v.* UNITED STATES

---

[11] See also *United States* v. *Victoria Gin Co.*, 48 CCPA 33, C.A.D. 759 (1960).